**In re INFOUSA, INC. SHAREHOLDERS LITIGATION.**

Consol. Civil Action No. 1956–CC.

Court of Chancery of Delaware, New Castle County.

Submitted: June 28, 2007.

Decided: Aug. 13, 2007.

Revised: Aug. 20, 2007.

R. Bruce McNew, of Taylor & McNew, LLP, Wilmington, DE, for Plaintiff Cardinal Value Equity Partners, LP.

Elizabeth M. McGeever and Laina M. Herbert, of Prickett, Jones & Elliott, P.A., Wilmington, DE; of Counsel: Lee D. Rudy, of Schiffrin Barroway Topaz & Kessler, LLP, Radnor, PA, for Plaintiffs Dolphin Limited Partnership I, LP, Dolphin Financial Partners, LLC and Robert Bartow.

Martin P. Tully, William M. Lafferty, and Jay N. Moffitt, of Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE; of Counsel: Yosef J. Reimer and Sudwiti Chanda, of Kirkland & Ellis, LLP, New York City, for Defendant Vinod Gupta.

Donald J. Wolfe, Jr., Arthur L. Dent, Brian C. Ralston, and Kirsten A. Lynch, of Potter Anderson & Corroon, LLP, Wilmington, DE, for Defendants George F. Haddix, Vasant H. Raval, Bill L. Fairfield, Anshoo S. Gupta, Elliot S. Kaplan, Martin F. Kahn, Bernard W. Reznicek, Dennis P. Walker, Charles Stryker, Harold W. Anderson, and infoUSA, Inc.

## *MEMORANDUM OPINION*

CHANDLER, Chancellor.

Before me is a complaint that tests the boundaries of the business judgment rule, the protection offered to defendant directors by Court of Chancery Rule 23.1, and the procedural rules by which a plaintiff brings a derivative complaint. After an activist shareholder petitioned this Court for access to books and records under 8 *Del C.* § 220, two plaintiffs brought separate lawsuits on behalf of infoUSA against its directors. Both complaints alleged that the board either collaborated in or stood by idly in the face of a garish collection of self-interested transactions, principally engineered by the CEO, and largest shareholder, Vinod Gupta. Such extravagances included the lease of aircraft and office space for personal use, the provision of a yacht, and a collection of luxury and collectible cars that would leave James Bond green with envy.

Plaintiffs Dolphin Limited Partnership I, LP, Dolphin Financial Partners, LLC and Robert Bartow (hereafter, "Dolphin") sought to recover derivatively the benefits expropriated from the company by the CEO and the defendant directors through claims for breach of fiduciary duty and waste. Plaintiff Cardinal Value Equity Partners LP (hereafter, "Cardinal Value"), on the other hand, pursued a more novel form of redress. In response to an offer from Vinod Gupta to take the company private, infoUSA formed a Special Committee that considered, and eventually rejected, his proposal. After the rejection, the board of directors dissolved the committee before it could canvas the market for other offers. Cardinal Value asked this Court to order the reinstatement of the Special Committee so that it could "complete" its mission. While Dolphin's litany of related party transactions formed the basis of its complaint, Cardinal Value relied upon many of the same facts to suggest the impotency of the infoUSA board of directors in the face of the demand required of derivative plaintiffs under Court of Chancery Rule 23.1.

 These early complaints, however, suffered from significant flaws, especially with regard to the requirement to demonstrate that any demand upon the board of directors would be futile. At times, plaintiffs' strategy appeared to challenge the presumption of the business judgment rule by hurling allegation after allegation at the company as a whole, instead of focusing with precision upon a given director's conflicts of interest. Although the standard test for demand futility under *Aronson*

does allow for the possibility that a given transaction is so egregious that it could not be an exercise of business judgment,[1] the Court must take great care that this exception does not turn the presumption of business judgment on its head. Like most derivative plaintiffs, Dolphin and Cardinal Value alleged that these transactions were not *in fact* an exercise of business judgment. For demand to be excused under *Aronson,* however, a plaintiff must plead specific facts to "overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim."[2] This presumption protects decisions unless they cannot be "attributed to any rational business purpose."[3] A plaintiff who seeks to excuse demand through the second prong of *Aronson* thus faces a task closely akin to proving that the underlying transaction *could not have been* a good faith exercise of business judgment.

Plaintiffs' individual allegations generally fail to meet this requirement. To take only one example: plaintiffs' assert that payments being made to former President William Clinton, and provision of private jet travel for Senator Hillary Rodham Clinton, represent waste of corporate assets.[4] Plaintiffs might be able to prove, at trial, that these expenditures were wholly unrelated to the business of the company or in some other way wasteful and in violation of the director's fiduciary duties. It would be difficult to conclude, however, that a public company might *never* legitimately purchase the services of a former president. Nor do plaintiffs allege any facts suggesting that these transactions must be presumptively illegitimate. Indeed, the company has estimated that the relationship with former President Clinton might be responsible for up to $40 million in sales.[5]

Plaintiffs attempt to compensate for the weakness of each particular allegation through an appeal to their collective unwholesomeness. The complaint and the accompanying briefs several times suggest that demand would be futile with respect to the defendant directors simply because no board, in the exercise of its business judgment, could ever have doled out so much largess to Vinod Gupta and his family and friends. The argument, while of a kind common to shareholder suits alleging excessive compensation, has been roundly rejected by this Court as circular reasoning that would eviscerate the business judgment rule of any purpose.[6]

■ On October 17, 2006, this Court dismissed without prejudice Cardinal Value's initial lawsuit, determining that Cardinal Value had failed to demonstrate

---

1. *See Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984) ("[I]n rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.")

2. *Rales v. Blasband,* 634 A.2d 927, 933 (Del. 1993).

3. *Sinclair Oil. Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971), *aff'd,* 332 A.2d 139 (Del. 1975).

4. The amended complaint refers several times to a "former high-ranking government official" and his wife, although any reader with a passing knowledge of current events should be able to narrow the list of possible officials down to a short-list of one. Given that Vinod Gupta has publicly discussed this relationship, further coy references serve little purpose. *See Gupta Says Clinton's Services Worth the Money,* Omaha World Herald, June 6, 2007, *available at* http://www.omaha.com/index.php?u_sid=2396941.

5. *Id.*

6. *See In re Tyson Foods, Inc., Consol. S'holder Litig,* 919 A.2d 563, 588 (2007).

through allegations of particularized facts that a majority of the then-current board of directors lacked the disinterestedness or independence to consider demand. Shortly thereafter, Cardinal Value filed a new complaint, and defendants moved to consolidate the case with the still-pending lawsuit brought by Dolphin. Over plaintiffs' objections, the Court consolidated the actions, finding that the interests of justice would be better served if the actions of the defendant directors—and their potential conflicts of interest—were considered as an integrated whole, rather than scattered semi-randomly as part of two separate lawsuits. Two more complaints followed.[7]

At long last, all relevant allegations brought by all plaintiffs find themselves in the same complaint. Through this amalgamation of allegations, plaintiffs have finally demonstrated that a majority of infoUSA's board of directors are neither sufficiently disinterested nor independent to consider objectively a demand upon the board and, thus, that demand is excused. Similarly, I conclude that plaintiffs have alleged facts sufficient to state a claim on which relief may be granted. Defendants' motion to dismiss is therefore denied.

## I. FACTUAL BACKGROUND

■ Plaintiffs have followed this Court's oft-issued advice and brought their action based upon documents received as part of a request for books and records under 8 Del. C. § 220. As a result, the amended consolidated complaint overflows with detail It is important to remember, however, that in considering a motion to dismiss, this Court is required to consider all well-pleaded facts in the complaint as true.[8] Defendants have not had the opportunity to rebut the majority of the factual contentions described below, and the Court makes no findings of fact at this stage.

### A. Background and the parties

A Delaware corporation with its principle place of business in Omaha, Nebraska, infoUSA provides sales and marketing, database marketing, and data processing solutions. Founded in 1972, the company maintains a proprietary database of over 210 million consumers and fourteen million businesses, and it sells this information on to over three million customers. The company also provides direct marketing, e-mail marketing, and telemarketing services to clients.

Cardinal Value, lead plaintiff with regard to Count I below, is record owner of 100 shares of the company, and as of March 31, 2007, beneficially owned or had sole investment authority with respect to approximately 5.6% of infoUSA's common stock. Cardinal Value has been a shareholder since March 31, 2004. Dolphin, one of the lead plaintiffs with respect to Counts II through V below, owns approximately 3.6% of info USA common stock, and has been a shareholder since June

---

7. Plaintiffs filed their first consolidated complaint on February 5, 2007. In the process of briefing defendants' motion to dismiss, it became obvious that plaintiffs had omitted facts from the consolidated complaint that had been included in earlier complaints from one plaintiff or another. Plaintiffs attempted to rely upon these facts in their answering brief, despite the well-settled rule that on a motion to dismiss the Court will consider only facts alleged in the complaint, not subsequent briefing. *Orman v. Cullman*, 794 A.2d 5, 28

n. 59 (Del.Ch.2002). The Court ordered the plaintiffs to resubmit their consolidated complaint, either incorporating by reference allegations in their earlier individual complaints, or specifically noting the facts upon which they intended to rely.

8. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del.2002)).

2005. Joining Dolphin is plaintiff Robert Bartow, owner of 2,000 shares of common stock. He has been a shareholder much longer than Dolphin, continuously holding shares since January 19, 2000.

Defendant Vinod Gupta has been a director and CEO of infoUSA since its founding in 1972, with the exception of a brief period between September 1997 and August 1998. According to a Schedule 13G filed on July 28, 2006, Vinod Gupta owns over 41% of the company's outstanding shares. This includes 4.4% of the company's shares held in irrevocable trust for his three sons and his charitable foundation.

Defendant George F. Haddix has served as a director since 1995. He chairs the Nominating and Governance Committee and is currently a member of the Compensation Committee. He runs PKWare, a software company, and is co-founder and former CEO and director of CSG Systems, and a member of the board of directors of Creighton University.

Defendant Vasant H. Raval, a director since 2002, chairs the Audit Committee and is a member of the Finance Committee. Since 2004, he has also held a seat on the Finance Committee, and was one of the three members of the Compensation Committee in 2004. A professor and chair of the Department of Accounting at Creighton University in Omaha, Nebraska, he also sits on Creighton University's board of directors.

Defendant Bill L. Fairfield was appointed to the board of directors on November 10, 2005, replacing defendant Harold Andersen. He serves on the Nominating and Governance Committee and Audit Committee, and chairs the Compensation Committee. He is also chairman of Dreamfield Capital Ventures LLC, a venture firm in Omaha, Nebraska, and is the former chairman of a wholly-owned subsidiary of infoUSA. On July 21, 2006, he was ap-pointed the company's "lead independent director." He serves, along with Vinod Gupta, as a trustee of the University of Nebraska foundation.

Defendant Anshoo S. Gupta, a director since 2005, is not related to Vinod Gupta. He serves on the Audit Committee.

Defendant Elliot S. Kaplan, a senior partner in the law firm of Robins, Kaplan, Miller & Ciresi LLP, has served on infoUSA's board since 1988. Robins, Kaplan, Miller & Ciresi provided $1.1 million worth of legal services to infoUSA in 2006.

Defendant Martin F. Kahn, who began his service on the board in 2004, was a member of the Nominating and Governance Committee, and Chair of the Finance Committee after 2004. He resigned on February 2, 2007. He is the former Chairman and CEO of One Source Information Services, which was acquired by infoUSA in 2004.

Defendant Bernard W. Reznicek joined the infoUSA board in March 2006, replacing former director Charles Stryker. He serves on the Governance and Nominating Committee and the Audit Committee. The former president and CEO of Omaha Public Power in Omaha, Nebraska, and a former director of CSG Systems, he is presently the president and CEO of Premier Enterprises. He also served as dean of the Creighton University College of Business Administration.

Defendant Dennis P. Walker, a director of infoUSA since 2003, is a member of the Nominating and Governance Committee and the Compensation Committee. He is the president and CEO of Jet Linx Aviation, which sells fractional interests in private jets, and was a founder, board member and executive vice president of Member Works, Inc., a telemarketing company based in Stanford, Connecticut.

Defendant Harold W. Andersen, a former director of infoUSA, served from Sep-

tember 1993 until November 2005. An alumnus of the University of Nebraska, he is the former President, CEO, Chairman and publisher of the Omaha World Herald company. He served on the Audit Committee between 1997 and July 2005, chairing it between 2001 and 2003. He also served on the Nominating and Governance Committee and the Audit Committee. He has also served as a director of two mutual funds in the Everest Mutual Fund Family. Vinod Gupta is a director and owns 100% of Everest Asset Management and Everest Investment Management.

Defendant Charles W. Stryker, a former director of infoUSA, served from May 2005 until January 2006.

### B. The entanglement of infoUSA with the personal interests of Vinod Gupta

At the heart of the complaint lies the accusation that Vinod Gupta and, to a much lesser extent, the other individual defendants have long used infoUSA to enrich themselves at the expense of shareholders. Indeed, the bulk of the complaint presents a vast, gaudy panoply of gilded excess, expressed either through frequent and allegedly unquestioned related-party transactions or through payments made directly for the benefit of Vinod Gupta and his family.

### 1. Related-party payments for "business" expenses: planes, yachts, automobiles, and more

■ The list of related-party transactions relating to transportation alone makes for lengthy reading. Between 2001 and 2005, infoUSA paid approximately $8.2 million to Annapuma Corporation, an entity 100% owned by V. Gupta. These expenditures covered the use of private jets, the use of the *American Princess* yacht,[9] and the use of a personal residence in California, as well as unidentified travel

---

9. Cardinal Value's amended complaint and the most recent amended consolidated complaint make none-too-subtle reference to the fact that the *American Princess* typically travels with an "all-female crew." *See* Am. Consol. Compl. at ¶ 63. The detail is presumably added with the hope of convincing the Court that the *American Princess* amounts to nothing more than a party barge inappropriate to any business purpose. Defendants strongly protest, pointing out that the article cited by plaintiffs, far from focusing on the salacious aspect of the crews' gender make-up, lauds the team for keeping a clean and well-maintained vessel, as well as an exceptional degree of discipline. Further, defendants protest that the yacht's staffing is consistent with infoUSA's policy of actively employing women and minorities at all levels.

Certainly, *Triton Megayacht News*, plaintiffs' citation for the *American Princess*, gives the "all-female" crew high marks, describing a group that keeps a clean, well-organized, highly professional boat and a captain with years of hard-won experience. *See Talk About Catching Your Eye: All–Female Crew*

*Run Tight Ship*, TRITON–Megayacht News, September 1, 2004, at http://www.the-triton.com/megayachtnews/index.php?news=869.

No advocate would come before this Court and advance an argument that defendants committed some impropriety by hiring an "all-female" legal team. Ship captains deserve no lesser presumption of propriety. Indeed, if any part of the article holds relevance to plaintiffs' case, it would be the comment of Vinod Gupta that "With a $3 million boat, you cannot be cheap about maintenance. Whatever she needs, we have to make sure she gets it." *Id.* This might at least raise some inference about the value of the boat to shareholders.

Plaintiffs' reference is notable for two reasons. First, it highlights the fact that though plaintiffs' allegations deserve great deference on a motion to dismiss, allegations come before the Court without significant benefit of counter-argument from an opposing party. As any litigation progresses, it inevitably becomes clear that each side exposes only the facets of the facts that most flatter their arguments. This case is undoubtedly little different. Initial allegations, though presumed to

expenses.[10] Vinod Gupta himself incurred much of the travel expenses, and Dolphin alleges that none of the documents provided in response to its § 220 request identified a business purpose for a substantial number of these payments. The log books of the *American Princess* yacht reveal little regarding the justification for these "business" expenses. Nor did defendants produce minutes or consents reflecting board approval of these substantial transactions as part of their response to Dolphin's § 220 request. Plaintiffs allege that many of these travel expenditures were either personal in nature or provided as gifts by Vinod Gupta to personal or political friends.

In its annual reports for 2004 and 2005, the company disclosed approximately $1.5 million in payments to Annapurna, supposedly made for "usage of aircraft and related services."[11] Defendant Raval, however, prepared a report to the board in February 2005 that revealed that about 40% of these payments had no relationship whatever to aircraft, and were instead payments for the *American Princess* yacht,

use of personal residences, and other undefined travel services. According to the amended consolidated complaint, the company's 2004 and 2005 10-Ks, filed with the SEC no earlier than March 16, 2005, were signed by defendants Raval, Kaplan, Kahn, Haddix, and Walker, although each of these defendants had access to the internal report before issuing their SEC filings.

At least as alleged, these arrangements resulted in a very sweet deal for Vinod Gupta: using infoUSA's money, he was able to purchase services from his own leasing company, pocket the profit on those services and then provide them to his personal friends and political associates.[12] Defendants insist, however, that the company has eliminated the conflict of interest through the expedient of purchasing Annapurna's interest in the private jets in two transactions totaling approximately $5.3 million. Dolphin's § 220 action, however, did not uncover board minutes, consents, or any evidence of board approval of these transactions. Similarly, the company now directly leases the *American Princess* yacht, rather than pay-

be true on a motion to dismiss, must nonetheless be viewed skeptically.

Second, and perhaps more importantly, it illustrates that the Court is not always the only audience to whom a legal argument is made. Rarely has the *American Princess* been mentioned in press accounts without some accompanying mention of its crew m embers. *See* Ronald Kessler, *Clinton Supporter's Company Hires Pelosi's Son as Senior Executive,* Pittsburgh Trib. Rev., June 7, 2007 at A1; Mike McIntire, *Suit Sheds Light on Clintons' Ties to a Benefactor,* N.Y. Times, May 26, 2007 at Al; Gretchen Morgenson, *When Shareholders Aren't Valued,* Int'l Herald Trib., August 28, 2006, at 10. Other articles have been even less flattering, but none of the articles above—published in respected newspapers, some by prize-winning journalists—appear to have looked much beyond plaintiffs' complaint as a source of information on the *American Princess.* I imagine that Captain Lupi has taken considerable umbrage at the slights

to a professional reputation that, at least insofar as it appears from materials appended to plaintiffs' own complaint, is entirely deserved.

10. Consol. Compl. at ¶ 65.

11. Consol. Compl. at ¶ 68. Plaintiffs similarly allege that over $1 million of the $2.2 million paid to Annapuma for "usage of the aircraft and related services" in 2003 were instead disguised payments for use of the yacht and rental of personal homes.

12. These payments include $18,480, listed as a "business development" expense, allegedly used to fly "the wife of a former high ranking U.S. government official and her four person entourage from New Mexico ... to White Plains, [New York]." Am. Consol. Compl. at ¶ 74. Records produced in the § 220 action illustrate that since 2001, infoUSA has paid nearly $900,000 in private jet charges to the former official and his family.

ing a Vinod Gupta-controlled entity for its use. Yet another Gupta firm, Aspen Leasing Services, received almost $100,000 from infoUSA over two years to provide the Gupta family with an H2 Hummer, a Honda Odyssey, a Mini–Cooper, a Lexus 330, a Mercedes SL500, and (presumably for the times when travel by land or air simply were not enough) a Glacier Bay catamaran. In 2005, the company directly purchased four of these luxury automobiles, again "eliminating" the conflict of interest. This strategy was also employed to internalize the costs of a skybox at the University of Nebraska football stadium previously leased from Annapurna.

Even after a thorough request for books and records, plaintiffs allege that they have received documentation reflecting board approval of only *two* of these related-party transactions: the acquisition of the skybox and the assumption of a mortgage on a building owned by Everest (another Gupta entity). On the other hand, the plaintiffs discovered the aforementioned report written by defendant Raval, which covered only a narrow sliver of the related party transactions alleged in the amended consolidated complaint. Raval restricted himself to payments made by the company in 2004, and did not address approximately $14 million of payments extending as far back as 1998. Even this report, however, conceded that the company had made $631,899 worth of payments for personal perquisites of Vinod Gupta, and commented that the company's practice of paying fixed monthly amounts to Annapurna for use of personal residences was "difficult to support under any circumstances."[13]

### 2. *Direct compensation of Vinod Gupta and his family*

Apart from the related-party transactions, the amended consolidated complaint alleges that Vinod Gupta plunders corporate assets for himself and his family, particularly through the receipt of shares and stock options. Since 1998, infoUSA has awarded Vinod Gupta options on 3.2 million shares, often allowing him to grant himself the lion's share of options allocated under the company's option plan. As a result, Vinod Gupta now controls over 41% of the company, and would control more if he exercised his other stock options.

This control has not always been exercised in a forthright manner. In 2005, the company asked for shareholder approval of an amendment to the 1997 Stock Option Plan in order to increase the number of shares available from five million to eight million. The amendment passed narrowly, by a vote of 28.2 million votes in favor to twenty million against, with the yeavotes bolstered significantly by Vinod Gupta's twenty-three million shares. Plaintiffs allege, however, that the proxy vote soliciting shareholder approval of the plan represented that Vinod Gupta owned only 20,135,006 shares and neglected to mention a further 2.4 million shares held by his sons' trusts and his charitable foundation.

The amended consolidated complaint also alleges that Vinod Gupta has misappropriated corporate information for personal gain through trades made by the V. Gupta Revocable Trust. On August 4, 2006, infoUSA announced that it had entered into a merger agreement to acquire Opinion Research Corporation ("ORC") for $12.00 per share in cash. After the merger, infoUSA filed a Schedule 13D disclosing the company's ownership of 4.7% of ORC acquired in open market purchases between April and August 2005, at prices

---

13. Consol. Compl. at ¶ 104; Ex. 2 at 3.

ranging between $6.50 and $8.50 per share. The filing also revealed, however, that the V. Gupta Revocable Trust had sold 22,000 shares of ORC over the week following the merger announcement at a price of approximately $11.50 per share. Given that ORC never traded above $9.13 per share in the months approaching the merger, the trust seems to have made a tidy profit off the announcement. The trust still allegedly owns 33,000 shares of ORC. Yet plaintiffs assert that Vinod Gupta never informed the board of his interest in the shares when he sought approval of the merger; nor did the board take action when it learned of the relationship after the filing of the Schedule 13D. The V. Gupta Revocable Trust did, in fact, sell its remaining shares to the company at cost, and disgorged $94,869 to the company. Plaintiffs contend that although the director defendants obviously knew of the impropriety of the earlier transaction, having disclosed it in a 13D, the trust returned the money only after it had been revealed in Dolphin's October 19, 2006 complaint.[14]

Finally, the amended consolidated complaint includes a few allegations of improper payments made directly to Vinod Gupta or his family from infoUSA. For instance, the Raval Report revealed that Vinod Gupta's wife Laurel received payroll payments and consulting fees from the company in 2004, as well as a total of $31,200 in fixed monthly reimbursements to cover expenses associated with a New York City apartment. The company has paid upwards of $266,000 over a period of five years for a number of vacation condos, one of which is owned by a son of Vinod Gupta. In two years, infoUSA paid the insurance premiums on a personal insurance policy held by the Gupta Family 1999 Irrevocable Trust, as well as various expenses incurred by Everest entities.

### C. Related-party transactions and conflicts of interest involving other directors

The amended consolidated complaint loses its level of detail and particularity, however, when it begins to address related-party transactions with directors other than Vinod Gupta. Although most of the directors are the subject of a few allegations of interested conduct, the allegations frequently lack detail and substance.

#### 1. Director fees

Each of the directors received compensation for their board membership. Of particular import, plaintiff alleges that defendant Raval, who holds a professorship at Creighton University, received approximately $450,000 in compensation from Creighton University between 2002 and 2006.[15] During the same period, he received $399,000 in director and committee

---

**14.** Contrary to defendants' assertions, the amended consolidated complaint does not concede that the board unilaterally insisted that Vinod Gupta return the money. *Compare* Am. Reply Br. in Supp. of Dels.' Mot. to Dismiss at 13–14 ("Plaintiffs concede that the directors *demanded* disgorgement to infoUSA") (emphasis added) *with* Am. Consol. Compl. at ¶ 136 ("[The Trust] disgorged back to the Company $94,869....."). At trial, defendants will have the opportunity to show that the funds were returned after the board of directors engaged in a prompt investigation followed by a vigorous struggle with Vinod

Gupta. For the moment, the Court may reasonably infer that the pressure to return the funds came more from Dolphin than a board that had been aware of the issue for several months.

**15.** Defendants state correctly that plaintiffs' estimate of Raval's salary is based solely upon publicly-available information on the average salaries of Creighton professors provided by the Nebraska government. The information is not specific to Raval.

fees from infoUSA, excluding the value of stock options.

### 2. Legal fees

Plaintiffs allege that infoUSA paid an average of $500,000 per year to Robbins, Kaplan, Miller & Ciresi L.L.P. for legal services between 2002 and 2005, an amount that rose to $1.1 million in 2006. The firm continues as counsel for the company. According to the complaint, the average income per partner at Robbins, Kaplan, Miller & Ciresi in 2004 was $672,000. Kaplan is a named partner in this firm.

### 3. Use of free office space

Plaintiffs allege that defendants Anderson, Walker and Haddix benefited from the use of free office space for their own businesses in buildings owned indirectly by V. Gupta and later owned by infoUSA itself. The complaint does not specify the size or value of this office space to defendants, but does provide the intriguing details that in 2001 infoUSA paid for an interior designer to assist with the decorating of these offices.

### 4. Co-directorships

Plaintiffs allege that Anderson served both as a co-director of Everest Investments and a director of two mutual funds in the Everest Mutual Fund Family, a privately-held mutual fund group. V. Gupta is President and owns 100% of the voting stock in Everest Funds Management, LLC, a Delaware corporation, and 100% of Everest Asset Management. According to the complaint, infoUSA paid $415,000 to Everest Asset Management for acquisition related expenses and $1 million to a fund in Everest Funds Management, LLC.[16] The complaint states that despite these business relationships, defendants

represented to stockholders that Anderson was an independent overseer of V. Gupta's compensation. Further, Anderson chaired the Audit Committee meeting at which the company approved infoUSA's earlier acquisition of an office building from Everest Investment Management.

The amended consolidated complaint alludes to several other business relationships between infoUSA, Vinod Gupta, and his director co-defendants. Fairfield is the former chairman of *businessCreditUSA.com*, a wholly-owned subsidiary of the company. Haddix, co-founder and former CEO of CSG Systems, participated as a member of an investor group that executed a leveraged buyout of CSG. As part of this effort, infoUSA invested $500,000 in a CSG acquisition fund organized by Trident Capital. Reznicek currently serves as the non-executive chairman of CSG Systems. One Source Information Services, acquired by infoUSA in 2004, succumbed to acquisition by infoUSA in 2004. Stryker formerly served as chairman and CEO of Naviant, Inc, a firm with which infoUSA signed a $12 million licensing agreement in 2001.

### 5. Contributions to Creighton University

Raval works as a professor at Creighton University and Reznicek is a former dean of the Creighton University College of Business Administration. V. Gupta allegedly provided a $50,000 grant to Raval through the V. Gupta School of Business Administration, and he continues to be a substantial economic contributor to the school. Further, Haddix sits on the board of Creighton University and on the advisory counsel to the school of business administration.

---

**16.** Besides an obvious similarity in the names, the Amended Complaint is not specific about the relationship between the various Everest companies.

### 6. *Travel*

The amended consolidated complaint alleges that several directors have followed Vinod Gupta's example in using corporate transportation for personal use, Kaplan is alleged to have flown on the corporate aircraft to resort locations. Haddix accompanied Vinod Gupta on at least one personal trip with Vinod Gupta and his wife, using the company jet. Plaintiff also alleges that Anderson accompanied V. Gupta on holiday trips to the Bahamas, Las Vegas and the Masters Tournament.

### 7. *Form 10–K for 2005*

Finally, plaintiffs allege that defendants Raval, Kaplan, Haddix, Kahn, and Walker (as well as Vinod Gupta) all face a fundamental conflict of interest in this litigation due to their approval of the company's 2004 and 2005 Form 10–K. The company filed the 2004 10–K six weeks after the Raval Report provided considerable detail as to the company's related-party transactions. Nevertheless, the disclosure statements described these transactions simply as "usage of the aircraft and related services."

### D. *The shareholder rights plan, Vinod Gupta's "creeping takeover," and the Special Committee*

Plaintiffs highlight an inconsistency in the company's shareholder rights plan. Vinod Gupta (as well as his family members and entities controlled by him) have been exempt from the company's poison pill since its inception on July 21, 1997. Although ostensibly created to protect shareholders from an unsolicited takeover of the company and to retain for shareholders the right to a control premium, plaintiffs protest that the rights plan has actually provided cover for Vinod Gupta to acquire an ever-greater percentage of the company through open-market purchases and extensive grants of executive stock options. The 3.2 million shares of stock granted to Vinod Gupta by the company since 1997 (often at the direction of Vinod Gupta himself) boosted his ownership interest from approximately 35% of outstanding stock to over 41%.

Plaintiffs assert that the rights plan provides protection against every possible raider except the barbarian already inside the gates. In February of 2005, V Gupta informed the second-largest shareholder of infoUSA that he was committed to increasing the company's value to $20 per share and beyond over the course of the year. In March, in conjunction with a personal purchase of 61,000 shares, Gupta further stated that he believed that infoUSA stock was worth over $18 per share. Notwithstanding his apparent confidence, on June 8, 2005, the company warned that its expected earnings had experienced a 5% decline. The share price then slipped below the $10 mark.

On June 13, 2005, just five days after the company disclosed its earnings report, V. Gupta offered to acquire all outstanding shares of infoUSA at $11.75 per share. In response, the company formed a Special Committee on June 24 to "review Mr. Vinod Gupta's proposal and potential alternatives."[17] Kahn, Stryker, Raval and A. Gupta joined the Special Committee and thereafter engaged Fried Frank Harris Shriver and Jacobsen LLP as legal advisors and Lazard Freres & Co. for financial advice. While the Committee was deliberating, the company announced that as of July 18, 2005, V. Gupta had agreed to refrain from taking certain actions related to acquisition of infoUSA securities, but that such restrictions would be lifted if the

---

**17.** Am. Consol. Compl. at ¶ 29.

company announced that it had entered into an agreement with a third party contemplating a merger, consolidation, sale of assets or other similar transaction.

During the Special Committee's deliberations, the board of directors displayed no lack of enthusiasm for going private. On July 22, 2005, the company restated its position that:

> [T]he Special Committee was formed to take all actions on behalf of the InfoUSA [sic] Board of Directors with respect to V. Gupta's proposal, including any actions that the Committee deems proper for the discharge of its fiduciary duties. *The Board of Directors authorized the Committee to* determine whether the Company should become a party to a transaction pursuant to V. Gupta's proposal or otherwise; negotiate, accept or reject the proposal in its sole discretion; *solicit, consider or negotiate alternative proposals;* engage independent advisors; *and take any other actions that the Committee deems to be appropriate or necessary.*[18]

Not only did the board of directors provide the Special Committee with a mandate allowing it to enter into negotiations with third parties, but on June 23 the board concluded that the offer to take the company private "potentially" served the best interest of all stockholders.[19] The complaint further alleges that while the V. Gupta offer remained open, the board was determined to seek a transaction eliminating the public stockholders' equity interests.

Nevertheless, on August 24, 2005, the Special Committee informed V. Gupta that his offer was inadequate, advising him that it had made no decision about other alternatives and would continue to explore strategic options for the company. Further, the Committee offered V. Gupta a choice as to how negotiations should proceed. In the first scenario, the Committee would negotiate exclusively with V. Gupta on the understanding that (a) any agreement would be subject to a post-signing market check and (b) V. Gupta would be required to support a sale of the company if a higher offer were ultimately obtained. In the event of a higher offer, V. Gupta would be allowed an opportunity to match. As a second possibility, V. Gupta could decline to agree to support alternative and potentially superior transactions. In this circumstance, the Special Committee informed him that they would continue to discuss his proposals but that he would not be given any exclusivity in negotiations.

On August 25, 2005, Kahn presented the Special Committee's report to the entire board, stating that the Special Committee unanimously agreed on the insufficiency of V. Gupta's offer. Further, it was the Committee's opinion that any future transaction should be subject to a market check. Kahn described how the Committee had communicated these conclusions to V. Gupta on August 24, and that V. Gupta had subsequently withdrawn his offer. The company announced this rejection on August 25, 2005. V. Gupta advised the Special Committee that he would not sell his shares or vote in favor of any other transaction.

On August 26, the board discussed the desirability of proactively seeking alternative proposals. Plaintiffs allege that the

---

**18.** Am. Consol. Compl. at ¶ 31. Defendants dispute that the Committee was actually empowered to search out alternative proposals. If the allegations of the complaint are considered to be true, however, then a mandate to "solicit ... alternative proposals" would suggest that the Special Committee was expected to enter the market in search of other offers.

**19.** Am. Consol. Compl. at 7.

tenor of this board meeting differed markedly from that of July 23. The board focused its attention on the potential disruption to company operations, the potential adverse effects on key employees, the uncertainty and possible adverse effect on employees in general and the consequential adverse impact on the interests of the stockholders. All five of the board members not on the Special Committee then voted to abolish the Special Committee. Three of the four Special Committee members opposed the motion. One member, defendant Raval, abstained.

Plaintiffs argue that the Special Committee was dissolved in order to prevent it from considering alternatives to the V. Gupta offer. Neither plaintiffs nor defendants, however, suggest that any such alternative had presented itself at the time that the board eliminated the Special Committee.[20]

Vinod Gupta remains exempt from infoUSA's rights plan, but since July 18, 2005, a series of letter agreements have prevented Vinod Gupta from acquiring, directly or indirectly, any further interest in infoUSA, excluding the exercise of options already granted to him. The standstill agreement ceases, however, in the event that infoUSA announces that it has entered into an agreement in contemplation of a merger, sale, consolidation, or another change of control.

**20.** The only outside bid mentioned in plaintiffs' complaint, an unsolicited offer of $20 per share by Acxiom in 1998, was tendered well before the Special Committee was a gleam in the board's eye. Plaintiffs also mention a meeting between V. Gupta and officials of Acxiom in "September or October" of 2005, but make no suggestion that any offer arose from that meeting.

**21.** Cardinal Value's initial amended complaint included a similar Count, but sought instead to have the Court reinstate the Special

## II. CONTENTIONS

Plaintiffs charge defendants with liability on five separate counts. Count I asserts that the going-private transaction proposed by Vinod Gupta, and the subsequent formation of the Special Committee, amounted to nothing more than a sham, and that defendants should reimburse the company for expenses incurred in connection with the offer.[21] Count II asks the Court to void the various self-dealing transactions between infoUSA and Vinod Gupta under 8 *Del. C.* § 144 because they were not approved by disinterested directors or a vote of disinterested shareholders and were not fair to the company. Further, Count II seeks to have certain grants of stock options declared void under 8 *Del. C.* § 157. In Count III, plaintiffs seek a declaratory judgment holding that the standstill letter agreement is invalid, having been adopted in contradiction to the terms of the Rights Plan and in any event impermissibly restricting the directors' statutory and fiduciary obligations to manage the company's business and affairs. Count IV alleges that all defendants have engaged in activities that violated their fiduciary duties to shareholders, particularly in approving (or condoning) the widespread use of corporate funds for personal expenditures. Finally, Count V alleges that these transactions constitute waste of corporate assets.

Committee. Though it is not beyond the equitable powers of the Court to nullify the decision of the board to disband the Special Committee, *see Hollinger Int'l Inc. v. Black,* 844 A.2d 1022, 1080–82 (Del.Ch.2004), *aff'd,* 872 A.2d 559 (Del.2005), the passage of time has rendered this relief an unattractive solution. The Court would be hesitant to conclude that a Special Committee established in 2005 remains the body appropriate to consider an acquisition in 2007.

Defendants move to dismiss the complaint on two principle grounds. First, defendants assert that the amended consolidated complaint lacks allegations sufficient to conclude that infoUSA's board of directors were incapable of considering demand as required by Court of Chancery Rule 23.1. Second, defendants argue that, despite the litany of self-interested transactions detailed at great length, plaintiffs have failed to state any claim for which this Court may grant relief.

◼ This Court follows well-settled standards governing motions to dismiss for failure to state a claim. All well-pleaded factual allegations made in the complaint are to be accepted as true.[22] Such facts must be set forth in the complaint and not merely in subsequent briefs.[23] Finally, this Court must draw all reasonable inferences in favor of the non-moving party, and dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[24]

## III. ANALYSIS

On October 17, 2006, I dismissed Cardinal Value's first amended derivative complaint for failure to show that demand upon infoUSA's board of directors was excused. The earlier complaint, like this one, regaled the Court at length with stories of fancy cars and favored perks for Vinod Gupta and his family. Much of Cardinal Value's argument boiled down to an argument by excess, the proposition that no board of directors exercising their business judgment in good faith could ever

have approved—or stood by idly while Vinod Gupta allocated to himself—the extensive array of perquisites that he has enjoyed over the years.

◼ Mere recitations of elephantine compensation packages and executive perquisites, however amusingly described, will rarely be enough to excuse a derivative plaintiff from the obligation to make demand upon a defendant board of directors. Sensational allegations may be grist for the mill of business journalists, but a Court cannot declare a grant of executive compensation to be excessive without immediately inviting the subsequent question; "How much is too much?" The answer to that question depends greatly upon context. The acumen of the business executive, the competitive environment in the industry, and the recruitment and retention challenges faced by the hiring corporation all bear heavily on an appropriate level of compensation. "How much is too much?" is a question far better suited to the boardroom than the courtroom.

◼ That is not to say that a Court should blindly defer to board decisions as to compensation. A court of equity must stand ready to oversee breaches of fiduciary duty in this domain as vigorously as in any other. Successful derivative plaintiffs, however, must focus intensely upon individual director's conflicts of interest or particular transactions that are beyond the bounds of business judgment. The appropriate analysis focuses upon each particular action, or failure to act, challenged by a plaintiff. Accumulating hundreds of allegations that individually would never with-

**22.** *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896–7 (Del. 2002)).

**23.** *Orman v. Cullman,* 794 A.2d 5, 28 n. 59 (Del.Ch.2002).

**24.** *In re Gen., Motors,* 897 A.2d at 168 (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896–97 (Del.2002)).

stand challenge under the test set forth by *Aronson,* in the hopes that collectively they will survive, is a strategy that succeeds in only the most uncommon and egregious of cases.

This process recognizes a simple, fundamental truth of institutional competency long understood in Delaware law. The value of assets bought and sold in the marketplace, including the personal services of executives and directors, is a matter best determined by the good faith judgments of disinterested and independent directors, men and women with business acumen appointed by shareholders precisely for their skill at making such evaluations.[25] The Court of Chancery does not safeguard shareholders by substituting the opinion of a judge for that of a business person merely because a plaintiff shows up at the courthouse asking for relief. Rather, a judge does his duty by ensuring that business decisions, whatever their merit, were undertaken by a director without consideration of his self-interest or for the sake of some third-party. Therefore, a skilled litigant, and particularly a derivative plaintiff, recognizing the institutional advantages and competency of the judiciary reflected in our law, places before the Court allegations that question not the merit's of a director's decision, a matter about which a judge may have little to say, but allegations that call into doubt the motivations or the good faith of those charged with making the decision.

Cardinal Value's original complaint put little emphasis on allegations that might lead the Court to conclude that directors other than Vinod Gupta lacked independence or were incapable of considering demand. Challenges to directors Haddix and Walker, among others, remained largely bereft of detail. Dolphin's action, filed only a few days later, similarly lacked elements that appeared in Cardinal Value's action. Indeed, after dismissing the first amended derivative complaint, I ordered the consolidation of the Dolphin and Cardinal Value proceedings largely to prevent "the strange prospect of the Court being forced to dismiss both complaints under Rule 12(b)(6) or Rule 23.1, even though the allegations ... taken as a whole, would survive a motion to dismiss."[26]

The amended consolidated complaint, however, finally incorporates all of plaintiffs' myriad allegations. Based on this final pleading, I conclude that plaintiffs raise issues sufficient for this Court to conclude that any demand upon the board of infoUSA would have been futile. Similarly, I conclude that the amended consolidated complaint states claims for which relief may be granted.

## A. Requirement of demand under Rule 23.1

The business and affairs of a Delaware corporation, absent exceptional circumstances, are to be managed by its board of directors.[27] To preserve the board's authority over ordinary business decisions, a plaintiff who initiates a derivative action must before the commencement of the action either demand that the corpo-

---

**25.** This is not to say, of course, that judges are *incapable* of deciding, normally after the presentation of expert evidence, the value of corporate assets. This Court's statutory authority in appraisal cases presupposes this ability. Such valuations, however, are second-best solutions undertaken in extreme circumstances, such as the elimination of a shareholder's right to continue to participate in the company.

**26.** Let. Op. at 2 (Jan. 22, 2007).

**27.** *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 2005 WL 2056651, at *31 (Del.Ch. Aug.9, 2005).

rate board take up the litigation itself or, in the alternative, demonstrate in a complaint why such a demand would be futile[28] Rule 23.1 requires that a plaintiff who asserts demand futility must "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[29] Vague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand.[30]

 There are two ways that a plaintiff can show that a director is unable to act objectively with respect to a pre-suit demand. Most obviously, a plaintiff can show that a given director is personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit.[31] A plaintiff may also challenge a director's independence by putting forward allegations that raise a reasonable inference that a given director is dominated through a "close personal or familial relationship or through force of will,"[32] or is so beholden to an interested director that his or her "discretion would be sterilized."[33] To demonstrate that a given director is beholden to a dominant director, plaintiffs must show that the beholden director receives a benefit "upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merit's of the challenged transaction objectively."[34] In short, plaintiff is required to show that a majority of the board of directors is either interested or lacking in independence.[35]

This kind of detailed, fact-intensive, director-by-director analysis is almost wholly lacking in plaintiffs' submissions to the Court. Instead, plaintiffs raise a host of issues that are either irrelevant to the issue of demand or supported by piecemeal references to barely-relevant legal authority. I address these arguments first in order to ensure that there is no misunderstanding as this case goes forward as to the grounds upon which the Court allows the case to continue. Having eliminated the red herrings, I then move on to consider the disinterestedness and independence of the board of directors of infoUSA.

1. *Analysis of demand under Rule 23.1*

 First and foremost, it is important to remember that demand is made against the board of directors at the time of filing of the complaint.[36] It is that board, and no other, that has the right and responsibility to consider a demand by a

---

28. *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993); *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

29. *Zimmerman ex rel. Priceline.com, Inc. v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec. 20, 2002).

30. *Id.*

31. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1049 (Del.2004).

32. *Orman v. Cullman,* 794 A.2d 5, 25 n. 50 (Del.Ch.2002).

33. *Beam,* 845 A.2d at 1050 (quoting *Grimes v. Donald,* 673 A.2d 1207, 1217 (Del.1996)).

34. *Telxon Corp. v. Meyerson,* 802 A.2d 257 (Del.2002).

35. *Odyssey Partners, L.P. v. Fleming Cos., Inc.,* 735 A.2d 386, 407 (Del.Ch.1999).

36. *Zimmerman v. Braddock,* 2005 WL 2266566, at *6 (Del.Ch. Sept.8, 2005), *rev'd on other grounds,* 906 A.2d 776, 2006 WL 2632237 (Del. Sept. 12, 2006).

shareholder to initiate a lawsuit to redress his grievances. The amended consolidated complaint contains allegations stretching back several years, and many of the directors who approved board decisions are no longer board members. Rarely, however, does the amended consolidated complaint specify or distinguish the directors implicated in a given action, or even seemingly recognize this important distinction. The fact that a *former* board authorized an outrageous action does not prevent a different board from considering a demand now.

A board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits. It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests. It is not enough for a shareholder merely to plead facts sufficient to raise an inference that the board of directors *would* refuse a demand. A court should not intervene unless that shareholder raises the more troubling inference that the refusal itself would not be a good faith exercise of business judgment.

It is from this concept that the *Aronson* and *Rales* tests for demand futility spring. Where a decision of the board is challenged, a plaintiff may demonstrate that demand was excused if it can be shown that there is reason to doubt either (1) the disinterestedness or independence of the board upon whom the demand would be made, or (2) the possibility that the transaction could have been an exercise of business judgment.[37] Where the complaint does not address an action taken by the board, however, or alleges that the board failed to act, the inquiry narrows. The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the *Rales* test: whether "as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to demand."[38] The spirit that clearly animates each test is a Court's unwillingness to set aside the prerogatives of a board of directors unless the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith.

### 2. Insufficient justifications for excusal of demand

Plaintiffs make several attempts to justify their failure to serve a demand upon the board that do not fit into the framework outlined above. Because all of these assertions rest upon a misreading of Delaware law, I address these arguments before applying the standard analyses of *Aronson* and *Rales*.

### a. Allegations of waste do not automatically excuse the requirement to make demand

First, plaintiffs distill from a few stray quotations in *Emerald Partners v. Berlin* the bold proposition that where a complaint states a claim for waste, demand is necessarily excused.[39] In *Emerald Partners*, a plaintiff that had made no demand alleged that the board of the defendant

---

**37.** *Aronson v. Lewis,* 473 A.2d 805, 811 (Del. 1984).

**38.** *Rales v. Blasband,* 634 A.2d 927, 934 (Del. 1993).

**39.** 1993 WL 545409, at *6 (Del.Ch. Dec. 23, 1993).

corporation had *affirmatively approved* a pledge of assets to a defendant director for his personal use, and that this pledge had been given for no consideration.[40] The Court, reasoning that the approval of the transaction could not have been an act of business judgment, held that demand was excused.

The decision in *Emerald Partners* is a far cry from a *per se* rule that an allegation of corporate waste excuses demand. Plaintiffs assert that two classes of waste excuse demand under the rule of *Emerald Partners*: first, the executive benefits and related-party transactions lavished upon Vinod Gupta; and second, the consulting contract with former President William Clinton. Both are easily distinguished, however.

■■■ The amended consolidated complaint itself alleges that many of these transactions were *never approved by the board of directors* and, thus, do not challenge actions taken by any board. Unlike the transaction in *Emerald Partners*, these benefits, however excessive, would be subject to the analysis of *Rales*, not *Aronson*. Curiously, plaintiffs' effort to circumvent this requirement relies upon a misreading of their own complaint. In explaining why the *Rales* test is inapplicable, they assert that "Plaintiffs challenge the *board's deci-*

*sion* to give V. Gupta a 'free pass' notwithstanding the Raval Report's conclusion that he should pay IUSA."[41] The amended consolidated complaint contains no allegation, however, that the infoUSA board made any decision whatsoever. Such an allegation would, indeed, render demand futile: plaintiffs need make no demand to a board that has already *affirmatively refused* to act. Mere inaction on the part of the board, however, does not relieve plaintiffs of the requirement to make demand.[42]

In an attempt to place director inaction within the scope of *Aronson*, plaintiffs baldly assert that "no person of ordinary, sound business judgment would give V. Gupta unfettered access to the company's treasury."[43] This circular conclusion cannot substitute for a legal argument. Unlike *Emerald Partners*, each of the individual transactions in this case may be seen to have some element of consideration and plaintiffs make little effort to specifically demonstrate that this consideration is inadequate. With respect to the consulting contract with Clinton, nothing in the amended consolidated complaint, beyond plaintiffs' conclusory allegations, supports a reasonable inference that it was unreasonable, let alone gratuitous and without consideration.[44]

---

40. *Id.* The greatest possible consideration alleged to have been provided by the company was a promise from the defendant director to indemnify the corporation in the event that the assets were subject to foreclosure.

41. Answering Br. in Opp'n to Defs.' Mot. to Dismiss at 33 (emphasis added).

42. As described below, I conclude that any such demand would have, in fact, been futile and, thus, demand is excused, but only because I find reason to infer that the infoUSA board is not disinterested or independent. Were the infoUSA board to consist of Vinod Gupta and eight individuals demonstrably indifferent to his personal needs, plaintiffs

would be required to make a demand upon the board of directors.

43. *Id.* at 29.

44. Indeed, plaintiffs' arguments that the $3.3 million six-year consulting contract and 100,000 share options were without consideration defy credulity. Plaintiffs do not directly assert that former President Clinton did no work that would constitute consideration, an allegation that would expose them to Rule 11 sanctions. Rather, plaintiffs maintain that the Court should infer that Clinton actually provided no consulting advice from the fact that (a) the contract contained no minimum amount of time required to be spent by Clin-

b. Allegations of illegal or *ultra vires* actions do not automatically excuse a plaintiff from demand

■ Plaintiffs next conjure an exemption from demand based on this Court's decision in *California Employees' Retirement System v. Coulter,* taking out of context the quotation, "[a]ny action of the board that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule and demand is excused."[45] Needless to say, the case does not stand for the *per se* rule plaintiffs suggest. In *Coulter,* the defendant board allegedly amended the terms of a stock option agreement without receiving required shareholder approval. The *Coulter* plaintiffs challenged an affirmative action taken by the board, and the Court applied the standard analysis under *Aronson* to conclude that a board acting in the good faith exercise of its business judgment could not approve an *ultra vires* action.

The holding in *Coulter,* however, is not a *per se* declaration that any allegation of *ultra vires* activity taken by any board will excuse demand. Rather, demand will be excused if a majority of the board that allegedly pursued the *ultra vires* action remains on the defendant board at the time demand is made. Otherwise, the Court should apply the *Rales* standard, which does not include an analysis of business judgment.

Plaintiffs next challenge the grant of options to Clinton as *ultra vires.* The infoUSA board in place at the time the options were granted, however, may not be the same as that to which demand must be made. Plaintiffs make no allegation as to the *date* on which Vinod Gupta granted an option to buy 100,000 shares to Clinton, though it may have occurred at any point between 2002 and 2007. Of the nine directors serving on the board at the time demand was required, only four were serving on the infoUSA board in 2002.

More importantly, plaintiffs once again misstate their own complaint. The amended consolidated complaint does not allege that the *board* granted options to Clinton. It specifically alleges that Vinod Gupta granted the options, that he lacked the authority to do so, and that no decision with regard to them has ever been made by the board.[46] The conclusion of *Coulter* applies where the Court reviews the ac-

---

ton and (b) the company produced no documentation showing that advice was ever actually provided.

Plaintiffs put forward very little, and ask the Court to presume quite a lot. Yet even were the Court to give plaintiffs the benefit of this *unreasonable* inference, it would be insufficient to show a lack of consideration. Assuming all the facts alleged in the amended consolidated complaint are true, the contract provided the company with an option for the time of a former president of the United States, a man who may reasonably be considered familiar with international business and political practice and possessed of an extensive network of useful contacts. To find that such an option is "so inadequate that no person of ordinary sound business judgment *would* deem it worth what the company paid," *Orloff v. Shulman,* 2005 WL 3272355, at *11 (Del.Ch. Nov.23, 2005), not only constitutes an unreasonable inference, but flies in the face of commercial reality. The president's speeches routinely command six-figure fees from similar corporate entities. *See* For Clinton, New Wealth in Speeches, Washington Post, Feb. 23, 2007, at A1 (citing public disclosure documents of Senator Hillary Clinton detailing speaking fees). Far from the "illusory" contract alleged by plaintiffs, the contract seems to be set at something close to a prevailing rate, and certainly within the bounds of business judgment.

**45.** *Calif. Public Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *11 (Del.Ch. Dec. 18, 2002).

**46.** See Am. Consol. Compl. at ¶ 114.

tions of a defendant board under the *Aronson* analysis. Where the amended consolidated complaint does not allege a specific decision by the board of directors, *Rales* proves the appropriate analytical framework.

### c. Allegations of breach of fiduciary duty do not automatically excuse the demand requirement

Plaintiffs urge the Court to conclude that many of the defendant directors *must* be interested because they variously acquiesced in exempting Vinod Gupta from infoUSA's poison pill, or because they permitted him to use the corporate jet, or they approved (or stood idle in the face of) certain related-party transactions.

This is precisely the reasoning that I rejected in *In re Tyson Foods, Inc. Shareholder Litigation.*[47] In *Tyson*, the derivative plaintiffs attempted to rebut the presumption of business judgment enjoyed by directors because the Tyson board had "demonstrated a consistent and unvaried pattern of deferring to anything the Tyson family wants, and of failing to exercise independent business judgment."[48] Yet there, as here, the argument fails due to its circular nature. In most derivative suits claiming waste, excessive executive or director compensation, or harm from other self-interested transactions, a plaintiff will argue that the board's decision to allow a

transaction was a violation of its fiduciary duties. If the plaintiff can then avoid the demand requirement by reasoning that any board that would approve such a transaction (or as here, a history of past transactions) is by definition unfit to consider demand, then in few (if any) such suits will demand ever be required. This does not comport with the demand requirement's justification as a bulwark to protect the managerial discretion of directors.[49]

To excuse demand in this case it is not enough to show that the defendants approved a discriminatory poison pill, granted V. Gupta generous share options or allowed the Gupta family to carry out self-interested transactions. Instead, the plaintiff must provide the Court with reason to suspect that each director did so not because they felt it to be in the best interests of the company, but out of self-interest or a loyalty to, or fear of reprisal from, Vinod Gupta. It is to this analysis that I now turn.

### 3. The interestedness and lack of independence of the infoUSA board of directors

The nine board members relevant to an analysis under either *Aronson* or *Rales* are Vinod Gupta, Haddix, Raval, Walker, Fairfield, Anshoo Gupta, Kahn, Kaplan, and Reznicek.[50] Plaintiffs must show that

---

47. 919 A.2d 563 (Del.Ch. Feb.6, 2007).

48. *Id.* at 588.

49. *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

50. These nine defendants were members of the board of directors on October 17, 2006, the date that Dolphin filed its first amended derivative complaint. A plausible argument might be made that February 5, 2007, the date of both plaintiffs' consolidated complaint, would make a better yardstick for demand. Because Kahn resigned on February

2, 2007, the latter date would be advantageous to plaintiffs: to prove that demand is futile as to an eight member board, plaintiffs need raise a doubt as to four directors, while five are necessary to impugn a nine-member board. *In re The Ltd. S'holder Litig.*, 2002 WL 537692, at *7 (Del.Ch.2002).

Surprisingly, plaintiffs do not specifically identify, either in the amended consolidated complaint or subsequent briefing, a relevant set of directors. Less surprisingly, defendants identify October 17, 2006, as an appropriate date. The choice of date makes no difference to the outcome of this Opinion, and so I

a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.[51] Plaintiffs never solidly grapple with the issue, preferring to assert that the board must be conflicted solely because no non-conflicted board could confer such munificence on Vinod Gupta. Nevertheless, I conclude that the amended consolidated complaint contains allegations scattered throughout that allow me to determine that a majority of these directors were either interested or lacking in independence at the time Dolphin filed its first amended derivative complaint.

#### a. V. Gupta

Neither party denies that V. Gupta was an interested party with respect to the amended consolidated complaint. Almost every paragraph of the complaint cites some transaction in which Vinod Gupta's interests are at stake and, if liability is imposed, he would almost certainly bear the brunt of any judgment. Plaintiffs' specific allegations of significant related party transactions suffice to suggest that he is interested with regard to the lawsuit.

#### a. The misleading Form 10–K and the self-interest of Kaplan, Walker, Haddix, Kahn and Raval

■ Although the mere threat of personal liability is insufficient to render a director interested in a transaction, plaintiffs are entitled to a reasonable inference of interestedness where a complaint indicates a "substantial likelihood" of liability

will be found.[52] The standard is difficult to meet,[53] and the vast majority of plaintiffs' allegations fail to rise to this considerable level. Nevertheless, the willingness of certain directors to issue Form 10–Ks that, allegedly, materially misrepresented the nature of benefits provided to Vinod Gupta strike me as egregious enough that the directors involved are likely to face personal liability.

■ When a Delaware corporation communicates with its shareholders, even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith.[54] Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim.[55]

The Raval Report was distributed to Walker, Haddix, Kahn and Kaplan on February 8, 2005, shortly before the company released its 2004 10–K on March 16, 2005. The 10–Ks affirmatively stated that payments made to Annapurna involved "usage of aircraft and related services." Yet the Raval Report indicates that almost $600,000 worth of the payments constituted compensation for the use of personal residences, the *American Princess* yacht, travel services or payments to contractors. No conceivable definition of candor will

assume *arguendo* that the earlier date is appropriate.

51. *Id.*

52. *See Rales,* 634 A.2d at 936; *Aronson,* 473 A.2d at 815.

53. *See Seminaris v. Landa,* 662 A.2d 1350, 1354 (describing the "rare case, envisioned by

the Supreme Court in *Aronson,* where defendants' actions were so egregious that a substantial likelihood of director liability exists").

54. *See Malone v. Brincat,* 722 A.2d 5, 11–14 (Del.1998).

55. *Id.* at 14.

shoehorn such payments into services "related" to the use of aircraft.

The Court may reasonably infer, based upon these allegations, that the directors who signed the 2004 and 2005 10–Ks did so knowing that the information contained therein fell far below the standards of candor expected from them. Those allegedly false disclosures were made shortly before the board was to ask shareholders, in a closely-contested vote, to approve the expansion of the company's 2005 Stock Incentive Plan. I note that in 2006, after these and other related-party transactions had been disclosed, Vinod Gupta, Haddix and Raval were narrowly re-elected in a proxy contest that can only be described as an open revolt of unaffiliated shareholders. Despite himself controlling, directly or indirectly, approximately 40% of the voting power of the company, Vinod Gupta received only 50.7% of the shares voted, with the opposing slate receiving over 48%.[56] This rising tide of shareholder dissatisfaction suggests that defendants had every motivation before the 2005 elections to conceal the true nature of the massive hidden perquisites being provided to Vinod Gupta, and that their failure of candor misled stockholders and damaged the company.

Thus, not only Vinod Gupta, but also Haddix, Walker, Kahn, Kaplan and Raval face a significant likelihood of personal liability arising from the present lawsuit, and may be considered to be interested for purposes of demand. This alone discharges plaintiffs' duty to show that demand would be futile under Rule 23.1. Nevertheless, I also find plaintiffs' additional allegations against Kaplan, Raval, Haddix, and Walker to be sufficient to raise a reason-

able inference that they are dominated by Vinod Gupta, and that their discretion has been sterilized.

### b. Kaplan

█ Plaintiffs contend that infoUSA's payments to Kaplan's law firm are material enough to raise a reasonable doubt as to his lack of interest and independence. I agree. The annual payments listed in the amended complaint come close to or exceed a reasonable estimate of the annual yearly income per partner of Robins, Kaplan, Miller & Ciresi L.L.P. The threat of withdrawal of such business is certainly enough, in the case of a legal professional, to raise a reasonable doubt as to a director's independence.

Defendants respond that this Court's conclusion in *In re The Limited,*[57] in which this Court held that a $400,000 payment to a director's in-store music supply business was on its own insufficient to raise an inference that the director's judgment was tainted, applies by analogy to Kaplan. The payments, after all, constitute a miniscule proportion of the total revenues of Kaplan's firm. Yet there is a unique relationship between a law firm and its partners. Legal partnerships normally base the pay and prestige of their members upon the amount of revenue that partners (and, more importantly, their clients) bring to their firms. Indeed, with law becoming an ever-more competitive business, there is a notable trend for partners who fail to meet expectations to risk a loss of equity in their firms.[58] The threat of withdrawal of one partner's worth of revenue from a law firm is arguably sufficient to exert considerable influence over a named part-

---

**56.** Am. Consol. Compl. at 20.

**57.** 2002 WL 537692, at *5 (Del.Ch. Mar. 27, 2002).

**58.** *See* Nathan Koppel, *Partnership is No Longer A Tenured Position,* WALL ST. J., July 6, 2007, at B1.

ner such that, in my opinion, his independence may be called into question.

### c. Raval

■ Plaintiffs attack Raval's independence as a director because (a) his remuneration as a board member exceeds the average salary reported for a professor at Creighton University, (b) he received a $50,000 grant from the V. Gupta School of Business Administration, and (c) both V. Gupta and Haddix have social and professional ties to his employer. Defendants point to a legitimate policy concern with plaintiff's reasoning, relying upon my decision in *In re Walt Disney Co. Derivative Litigation:*

> [T]he Delaware Supreme Court has held that "such allegations [of payment of director's fees], *without more,* do not establish any financial interest," ... [To hold otherwise] would be to discourage the membership on corporate boards of people of less-than extraordinary means. Such "regular folks" would face allegations of being dominated by other board members, merely because of the relatively substantial compensation provided by the board membership compared to their outside salaries. I am especially unwilling to facilitate such a result.[59]

My concern about this issue has not diminished. Nevertheless, plaintiffs do not rely upon Professor Raval's income alone.[60] Raval's receipt of a financial grant deriving from his relationship with V. Gupta, as well as the presence of defendants on other boards that could affect his professional advancement, are sufficient to raise a reasonable inference necessary to call his independence into question.

### d. Haddix and Walker

When the Court dismissed Cardinal Value's original amended complaint, it put significant emphasis on the failure of plaintiffs to allege facts sufficient to excuse demand against Haddix and Walker. Cardinal Value's allegations against Haddix and Walker, as originally pleaded, were simply too vague for the Court to make any reasonable inference as to their lack of independence. The consolidated plaintiffs, however, have now put forward facts that are sufficient to meet the requirements of Rule 23.1. Both Haddix and Walker receive rent free office space from which they allegedly operate their own independent businesses, and plaintiffs have put together a collection of allegations, albeit in a disjointed fashion, from which this Court can infer that this benefit is sufficiently material to question their independence.

**59.** 731 A.2d 342, 359–60 (Del.Ch.1998) (emphasis added) (quoting *Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988)).

**60.** Defendants also contend that plaintiffs make no allegation as to Professor Raval's actual income and, without this, plaintiffs cannot show that Raval is beholden to V. Gupta. As an initial matter, plaintiffs' allegations as to Vinod Gupta's influence over Raval's professional future, through his influence on Raval's employer, carry a greater degree of weight than purely financial considerations. As for the financial entanglement, defendants ask too much of a derivative plaintiff with limited opportunity for discovery, even considering the heightened pleading standards of Rule 23.1. Plaintiffs have sought out data from publicly-available sources that, while perhaps not infallible or perfectly accurate, suffice to give the Court a starting point for consideration. Further, if defendants desired, they could have provided plaintiffs with documentation concerning Raval's salary as part of the § 220 action. It is not too much to ask the Court reasonably to infer that college professors are not generally paid lavish sums, or that Professor Raval's income, even if it were substantially higher than the average professor's, is likely to be no more than one order of magnitude away from the average.

Defendants object that the bare words "office space" cannot establish materiality, and there is some merit to this argument.[61] Provision of a single slate-gray *Dilbert-style* cubicle to directors whose income, by plaintiff's own contention, almost certainly exceeds $100,000 a year amounts to an almost incidental benefit. On the other hand, several hundred square feet set up to allow JetLinks Aviation (Mr. Walker's company) or PKWare (Mr. Haddix's company) to operate a call center would certainly raise questions as to their impartiality and independence. Cardinal Value's original complaint provided almost no guidance on this issue and, thus, I determined that the accusation must be considered "vague or conclusory."[62]

 The amended consolidated complaint, however, now contains several allegations that were lacking in Cardinal Value's original attempt. Most importantly, the amended consolidated complaint attaches and incorporates the Raval Report itself. Prepared for the benefit of the infoUSA board of directors, the Report itself expresses concern that the office space may present a conflict:

> The Everest Building has several occupants, including InfoUSA, Herald (Andy) Andersen, PKWARE, Everest, Danny Walker, and Annapurna. The *question of independence of a director may surface* if the director of his organization is an occupant of InfoUSA premises and particularly, if no rental/lease agreement exists between InfoUSA, and the director or his organization. To avoid ambiguity on these grounds, it *would help* to have this question fully addressed by each director-occupier with InfoUSA.[63]

Plaintiffs maintain that, despite the recommendation of the report, no payments have been made to recompense the company for rent. Nor do any leases between the company and Haddix or Walker appear to have materialized over the course of Dolphin's extensive § 220 request.

From this, the Court could make two reasonable inferences. First, the Court could infer that Haddix and Walker occupy two relatively Spartan cubicles in the Everest Building, and that this benefit is, at best, a *de minimus* perquisite provided more for the convenience of the company than the directors. Alternatively, the Court could infer that Raval, himself a professor of business who can be presumed to know something about conflicts of interest, based his concerns upon a reasonable assessment of the personal interests of directors, and that the office space provided to Haddix and Walker may materially affect their judgment. If Raval believed the office space could raise a question as to independence, there is no reason this Court should not do so.

The amended consolidated complaint provides very little detail regarding the allegations against Haddix and Walker. It may appear, after discovery, that the offices occupied by these two directors possessed not even a window facing a grimy alleyway. Plaintiffs have not had the benefit of discovery, however, and it would be too much to expect for plaintiffs now to provide the Court with a detailed floor-plan of the Everest offices; an estimate of

---

**61.** Cardinal Value's original amended complaint contained very little more than this simple allegation.

**62.** *See Zimmerman ex rel. Priceline.com, Inc. v. Braddock,* 2002 WL 31926608, at *7 (Del. Ch. Dec. 20, 2002).

**63.** Am. Consol. Compl. Ex. 2 at 4 (emphasis added).

the cost of office space in Omaha, Nebraska; the square footage occupied by each defendant; an estimate of the personal net worth of Haddix and Walker; and any of the various other factors that would need to be presented to establish by a preponderance of the evidence that the two directors lack independence. For the moment, Raval's concerns, prepared for the board of directors before Cardinal Value brought its initial complaint, suffice to suggest that Haddix and Walker receive benefits sufficient to sterilize their discretion.[64]

### e. The remaining directors

██ Plaintiffs make only half-hearted attempts, at best, to impugn the remaining directors. Reznicek is alleged to be the non-executive chairman of a company in which infoUSA has made an unquantified investment, as well as being the former dean of Creighton University. A similar allegation is leveled at Fairfield, a former chairman of an infoUSA subsidiary. Kahn also worked for a company acquired by infoUSA, and later recommended, as chair of the Special Committee, that its members receive compensation for their efforts. As for Anshoo Gupta, the sole grounds to question his independence seems to be that he graduated from the same *alma mater* as Vinod Gupta, with no allegation that the pair was ever classmates or associates.

Plaintiffs supplement these meager efforts with nothing that would allow the Court to reasonably infer that these benefits are sufficient to render the directors beholden to Vinod Gupta. The allegations against Reznicek, in sharp contrast to those concerning Raval, fail to outline the materiality of his relationship with Vinod Gupta. Nor does the amended consolidated complaint suggest that the current or prior business relationships of Fairfield or Kahn rise to the level where the "threatened loss [of these benefits] might create a reason to question whether the director is able to consider the corporate merit's of the challenged transaction objectively."[65]

### 4. *Plaintiffs have met the requirement to show that demand would be futile*

Plaintiffs have shown that six directors—Vinod Gupta, Haddix, Walker, Raval, Kahn, and Kaplan—face a sufficient likelihood of liability that their own self-interest would prevent them from considering objectively a demand upon the board. Further, the allegations against Kaplan, Raval, Haddix, and Walker raise a reasonable inference that each is dominated by Vinod Gupta and, thus, incapable of impartially considering demand. As such, demand is excused, and defendants' motion must be denied so long as plaintiffs have stated a claim for which relief may be granted.

### B. *Defendants' motion to dismiss for failure to state a claim*

Despite plaintiffs' reluctance to focus on legal substance, I am not convinced that this is such a "blunderbuss of a mostly conclusory pleading"[66] that I may conclude "with reasonable certainty that the plaintiffs would not have been entitled to the relief sought under any set of facts which could be proven to support the action."[67] On all but part of Count III, plaintiffs

---

**64.** *Beam,* 845 A.2d at 1050.

**65.** *Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002).

**66.** *Brehm v. Eisner,* 746 A.2d 244, 267 (Del. 2000).

**67.** *Id.* at 268 (Hartnett, J., concurring) (quoting *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985)).

assert allegations sufficient to survive a motion to dismiss.

 Plaintiffs' burdens in the face of a motion to dismiss under Rule 12(b)(6) are less onerous than the requirements of factual particularity under Rule 23.1. Rule 8(a) provides the relevant notice-pleading standards by which the amended consolidated complaint should be judged,[68] and although a Court may scrutinize allegations more closely than it would in other cases,[69] this burden does not reach the factual particularity requirements necessary to excuse demand. On the other hand, the directors implicated by the substantive allegations of the amended consolidated complaint are not necessarily the same as must be considered with regard to excusal of demand. Rather, the Court focuses on the directors actually alleged to be implicated in the challenged act (or failure to act). The motion to dismiss should be granted only if plaintiffs are not entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[70]

Many of plaintiffs' substantive allegations challenge the business judgment of the approving board of infoUSA. In many cases, the relevant analysis will include a showing by the plaintiffs that directors were either interested in the transaction or dominated by Vinod Gupta. The analysis for such interest is similar to that conducted under either *Aronson* or *Rales*. As such, I conclude that unless otherwise noted, at all times relevant to the amended consolidated complaint, defendants Haddix, Walker, Raval and Kaplan lacked independence from Vinod Gupta.

### 1. Count I: Breach of fiduciary duty through the creation of the Special Committee

 Plaintiffs assert that the formation, and subsequent dissolution, of the Special Committee constitutes nothing more than a sham, an effort by dominated directors to allow Vinod Gupta to acquire infoUSA at a lowball price. Defendants respond that this argument is factually incoherent given that the Special Committee rejected the offer and, thus, acted independently from Gupta. If the Court were to find that the Committee was a sham, defendants argue, then the act of the whole board in disbanding the "sham" committee should not be a violation of fiduciary duties.

Defendants misstate the thrust of Count I. As alleged in the amended consolidated complaint, a board consisting of dominated directors formed the Special Committee. Given the extensive nature of the related-party transactions recited in the complaint, I may infer that the directors knew, or at least suspected, that any buy-out offer would be subject to protest from independent shareholders. A rational buyer, even one wholly unfaithful to his fiduciary duties, would appoint the most independent members of the board to such a Special Committee in the hopes of the acquisition surviving subsequent litigation. This does not mean that the buyer would expect rejection, but merely that the committee would be constituted such that success in the committee would not obviously lead to failure in court.

---

**68.** *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 581–83 (comparing motions to dismiss under Rule 12(b)(6) and Rule 23.1).

**69.** *See Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *4 (Del.Ch. Apr.21, 1995), *aff'd*, 672 A.2d 35 (Del.1996).

**70.** *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–7 (Del. 2002)).

Properly understood, plaintiffs' allegation is that the infoUSA board of directors, and particularly the members dominated by Vinod Gupta, counted on the Committee to behave like a kitten, and were surprised when it bared its teeth. Kahn, Stryker, and Anshoo Gupta, according to plaintiffs, took their mandate seriously and began to search for potential acquirers for the company. Faced with this insurrection, Gupta and the conflicted members of the board (Haddix, Walker, Kaplan) voted to disband the Special Committee. Plaintiffs' contention is that defendant directors should reimburse the company for the cost of instituting a process that from the beginning was intended to allow Vinod Gupta to acquire the company at a discount, and that the dominated directors eliminated as soon as there might be some risk of it attracting a valuable alternative offer for shareholders.[71] The sudden *volte face* between public statements of corporate representatives as to the advisability of a going-private transaction before and after Vinod Gupta's offer was rejected lends some plausibility to this allegation.[72]

Defendants offer an alternate explanation of the going-private transaction, explaining that Vinod Gupta sought to protect shareholders against short-sellers who might hurt the corporation's share price. This may be true, but at this stage I am required to draw all inferences in favor of the plaintiffs. The characterization of the going-private process as a sham is well within the bounds of plausibility, based upon the allegations in the consolidated complaint. If defendants actually engaged in this form of wasteful legerdemain in order to help Vinod Gupta acquire the company at an inequitable price, it constitutes a violation of their fiduciary duty of loyalty, even if it did not succeed. Equity may require that the directors of a Delaware corporation reimburse the company for sums spent pursuing such faithless ends—if the evidence at trial bears out such a claim. Defendants' motion to dismiss must, therefore, be denied with respect to Count I.

### 2. Count II: Invalidity of transactions under 8 Del. C. § 144 and § 157

Plaintiffs challenge the related-party transactions between infoUSA and

**71.** Vinod Gupta, Kaplan, Haddix, Walker, and Andersen all voted to disband the Special Committee, and Raval abstained, while Stryker, Anshoo Gupta, and Kahn voted to stay the course. Setting aside Raval's absention, three of the eight votes against the measure were cast by directors dominated by Vinod Gupta. If the votes of directors interested or lacking in independence are discarded, the Special Committee would have survived by a vote of, at best, three to one.

Because it is irrelevant to the outcome of this motion, I have not discussed the sufficiency of plaintiffs' allegations against Andersen. I pause only to note that his extensive business contacts with Vinod Gupta are far more detailed and complex than those alleged against Kahn, Fairfield, or Reznicek, and that his independence is an open question.

**72.** On June 23, 2005, Vinod Gupta remarked that, "I think this Company and this Compa-

ny's employees would be better served if we were private and not have to worry about all the regulations and stock price and analysts." Am. Consol. Compl. at 32. After his going private offer was rejected, however, the dominated majority of the board of directors allegedly discovered that pursuing any going-private transaction but Vinod Gupta's would disrupt operations, jeopardize relationships with key employees, and subject the company to uncertainty. Am. Consol. Compl. at 45. At trial, of course, defendants will have the opportunity to present facts explaining the advisability of a going-private transaction on June 23, but its subsequent risky nature less than one hundred days later. For the moment, however, plaintiffs are entitled to the reasonable inference that the motivating force behind this change of heart was the interests of Vinod Gupta.

Vinod Gupta (or entities controlled by him), and ask the Court to rescind the transactions and require the defendants to reimburse the company. Under 8 *Del. C.* § 144, a related-party transaction may not be set aside merely due to its self-interested nature if it (a) has been approved by a majority of the disinterested directors of the corporation, even if that majority is not a quorum, (b) has been approved by a majority of disinterested shareholders, or (c) is fair to the corporation as of the time it is authorized, approved, or ratified by the board, a committee, or the shareholders themselves. Plaintiffs allege that none of these safe-harbors have been met.

Based upon the documents collected in Dolphin's § 220 request, plaintiffs alleged that the board never approved Vinod Gupta's personal private jet travel, payments to Vinod Gupta for use of his personal residences, the use of the luxury cars and the catamaran, or the personal use of the *American Princess* yacht.[73] No facts are before the Court that suggest these transactions ever secured board approval and no party suggests they have been put to a shareholder vote. The sole question,

therefore, is whether the transactions were fair to the corporation. Given the extensive nature of the related-party transactions detailed in the amended consolidated complaint, as well as the conclusions of the Raval Report that a limited selection of these transactions were admittedly unfair to the corporation and should have been borne personally by Vinod Gupta, it is reasonable to infer at this stage that the transactions in the amended consolidated complaint had no business purpose and were unfair to the corporation. Defendants had the opportunity during Dolphin's § 220 action to provide documentation that would rebut this inference, and will have an opportunity to do so as this litigation progresses. For now, however, plaintiffs have pled facts sufficient to survive a motion to dismiss.[74]

Plaintiffs also challenge an award of stock options to Clinton in violation of DGCL § 157. Under the 1997 Stock Option Plan, which according to defendants provided the authority to grant these options,[75] grants of options were to be overseen by the Plan Administrator, and the administrator was required to be either

---

**73.** Defendants object that the amended consolidated complaint does not specifically state that Vinod Gupta used the yacht for personal trips completely unrelated to company business. Am. Reply Br. in Supp. of Defs.' Mot. to Dismiss at 18. Yet the amended consolidated complaint does allege that the *American Princess* log book "does not reveal any business purpose" for the yacht's usage, Am. Consol. Compl. at ¶ 67, and the Raval Report states that, in 2004 alone, $277,899 worth of charges to Annapurna for use of the *American Princess* should have been paid by Vinod Gupta. From this, the Court may reasonably infer that the yacht has not been used exclusively for business purposes.

**74.** The skybox at the University of Nebraska provides the sole exception to my analysis above. Both parties agree that infoUSA provided minutes showing that the board, or at

least the Audit Committee, approved the purchase of the skybox, albeit several months after the fact. *See* Am. Consol. Compl. at ¶ 98 (asserting approval by Audit Committee); Answering Br. in Opp'n to Defs.' Mot. to Dismiss at 7 n. 4 (asserting approval by the whole board). Plaintiffs do not suggest that the votes were less than unanimous, nor do they provide detail in the amended consolidated complaint sufficient for the Court to infer the entire constituency of the Audit Committee in October 2003. Assuming, in the absence of any intimation to the contrary, that the vote was unanimous and a single disinterested director was on either the board or the Audit Committee, plaintiffs fail to allege that the approval of the skybox purchase fell outside the bounds of § 144.

**75.** *See* Opening Br. in Supp. of Defs.' Mot. to Dismiss at 38.

the board or a committee thereof.[76] Plaintiffs allege that these options were granted unilaterally by Vinod Gupta, and no board minutes or other resolutions are currently before the Court suggesting that any authorized body consented to their distribution.

Despite the allegation that the board never approved the grant of options, defendants confusingly insist that the distribution falls within the scope of the board's business judgment. This might be true in a claim for waste: plaintiffs can hardly maintain that the grant of options was gratuitous, or that had the board approved the payment it was outside any rational business judgment. The charge, however, is quite different: that no decision of the Plan Administrator, who plaintiffs allege is not Vinod Gupta, protects the option grant. So long as plaintiffs prove this contention at trial, the Court may rescind the options or hold defendants liable for them. Thus, plaintiffs state a claim with respect to this aspect of Count II.

### 3. Count III: Invalidity of the July 21, 2006 Letter Agreement

 Plaintiffs' arguments fail, however, when it comes to the validity of the July 21, 2006 letter agreement between Vinod Gupta and infoUSA. The agreement restricts Vinod Gupta's ability to purchase additional shares of infoUSA, either directly or indirectly, in exchange for which the company has agreed not to modify the Rights Plan to include Vinod Gupta.

The allegations in the amended complaint concerning the Rights Plan remain somewhat confused. Plaintiffs allege that the minutes of the board meeting at which the Rights Plan was approved do not mention any exclusion of Vinod Gupta from its terms, but plaintiffs do not contest that the

board approved a plan that includes such provisions. Plaintiffs then spend considerable effort arguing that the Rights Plan is ill-designed to serve the needs of the company, in that it does not protect shareholders from a "creeping takeover" by Vinod Gupta. Finally, plaintiffs assert that the letter agreement—which at least purports to prevent precisely the takeover about which plaintiffs are concerned—impermissibly restricts the ability of the board of directors to include Vinod Gupta in the Rights Plan.

Plaintiffs seem not to disagree with the ends chosen by the board of directors. After all, applying the poison pill to Vinod Gupta would either prevent him from acquiring further shares in the company (assuming that the board exempted his current shareholdings from the pill) or almost certainly trigger an immediate contest for control by a majority shareholder (assuming that the board made no such exemption, and presented him with the prospect of immediate dilution). If the board believed that no alternative bidders were on the horizon, triggering an immediate contest for control might make little sense. Adopting a letter agreement, on the other hand, gives Vinod Gupta no real incentive to trigger an immediate contest for control, while at least potentially preventing the very takeover plaintiffs allegedly fear.

Choosing to adopt a letter agreement rather than amending the poison pill thus rests within the acceptable business judgment of the board of directors. Plaintiffs' attempts to avoid this business judgment fail as a matter of law. First, the amended consolidated complaint suggests that the letter agreement is invalid because it constitutes an amendment to the Rights Plan itself, and that such an amendment cannot be made if it would adversely affect

**76.** *Id.* Ex. 4 at 21.

the holder of the Rights.[77] The letter agreement, however, does not modify the Rights Plan: Vinod Gupta is exempt from its consideration whether the agreement is valid or not. Nor is it reasonable to conclude that an agreement restricting Vinod Gupta from acquiring further shares of the company somehow prejudices the rights of minority shareholders.

The letter agreement does not impermissibly deprive the board of directors of their statutory duty to manage the company under 8 *Del. C.* § 141(a). Every contract approved by a board of directors, after all, limits the discretion of the board in future transactions, but a board is empowered to make agreements with other actors in commerce, including its own shareholders.[78] Nor does the agreement fall into the range of self-interested transactions similar to those in Count I. Plaintiffs admit that the letter agreement was signed by Fairfield and make no allegations that would suggest it was adopted without unanimity. Although five members of the full board at the time of the July 21, 2006 agreement were dominated by Vinod Gupta, plaintiffs do not suggest that the remaining directors voted to reject it. Without such a pleading, Count III must fail, as the agreement must be deemed to have been approved by a majority of the independent directors.

### 4. *Count IV: Breaches of fiduciary duty*

Count IV makes several general and specific allegations of breach of fiduciary duty on behalf of the infoUSA board of directors. Plaintiffs object to (a) Vinod Gupta's use, with mfoUSA's approval or acquiescence, of corporate assets for personal purposes, including a long list of itemized related-party transactions, (b) the

mischaracterization and concealment of many of these related party transactions by the board, (c) the failure of the board to correctly disclose the correct number of shares beneficially owned by Vinod Gupta in the 2005 proxy statement, (d) the board's refusal to include Vinod Gupta in the terms of the shareholder rights plan, and (e) Vinod Gupta's acquisition of shares in ORC through the Gupta Trust. I address each of these concerns in turn.

#### a. Approval of or acquiescence to the related-party transactions, and subsequent mischaracterization

■ To defendants, Count IV represents nothing more than plaintiffs' disagreement as to the business judgment made by the board of directors. Certainly, neither plaintiffs' complaint nor their subsequent briefing artfully approaches the analysis required in a claim for relief on a theory of breach of fiduciary duty. An ideal complaint—to say nothing of subsequent briefing—would separately address each challenged transaction; specifically mention whether that transaction was or was not approved by the board of directors (and provide the composition of the board); describe the purported consideration received by the company for the transaction, if known; and then conclude with an explanation of why transaction could not have been made in good faith. Unfortunately, plaintiffs' submissions to the Court fall far short of this model of clarity.

Rule 8(a) does not demand, however, that plaintiffs present a paragon of the well-organized complaint. The allegations are sufficient to demonstrate that at all times between 2003 and 2007 (while Walker, Haddix, Kaplan and Raval were members of the infoUSA board), Vinod Gupta dominated the board of directors. During

---

**77.** Am. Consol. Compl. at 118.

**78.** *See Sample v. Morgan,* 914 A.2d 647, 673 n. 79 (Del.Ch.2007).

that period, plaintiffs point to a collection of related-party transactions that, taken individually, might fall within the business judgment of an independent board acting in good faith.[79] Yet the Court should not be blind to the fact that, in this case, literally dozens of such transactions have taken place, each blessed or passively noted by a board of directors with close personal and professional ties to the principal beneficiary of such largess. Such allegations might not meet the more strict pleading requirements of Rule 23.1, but plaintiffs need not satisfy that burden here.

I also find that plaintiffs are entitled to a reasonable inference of bad faith due to the efforts taken by defendants to conceal their true nature. If one reads the Raval Report, replete with concerns about the propriety of related-party transactions undertaken for the benefit of Vinod Gupta and other directors, and then studies the subsequently-filed Form 10–Ks, one finds it impossible to understand how a director who had been provided with the former could, in good faith, approve of the latter. According to defendants, "the directors' decision that the Forms 10–K adequately described the payments to Annapurna and that the 2005 Proxy Statement was accurate and complete falls squarely within the business judgment rule."[80] The rule does not require the Court to bless the conclusion of a director that is self-evidently nonsense on stilts, nor does it protect a board that looks into the sun and names it the moon. The affirmative action taken by the board to conceal the nature of payments made to Vinod Gupta and others, as well as the sheer volume of self-interested transactions, allows me to infer, at this stage, that the transactions were made in bad faith by a self-interested CEO, and approved or ignored by a dominated board.[81] If plaintiffs prove each of these allegations, the defendant directors will all be in clear violation of their fiduciary duties. Count IV thus states a claim with respect to the enumerated related-party transactions.

b. Failure to disclose Vinod Gupta's beneficial shareholdings in advance of the 2005 meeting

During the 2005 annual meeting, infoUSA asked its shareholders to approve over $600,000 worth of related-party transactions in 2004 alone, and argue that the decision not to do so does not constitute a violation of fiduciary duty. If an affirmative decision not to pursue reimbursement were made by a disinterested board, defendants' argument would have some merit. I see no reason to infer, however, that the mere preparation of the Raval Report demonstrates the board's good-faith effort to review related-party transactions and obtain services from unrelated third-parties. *See* Am. Reply Br. in Supp. of Defs.' Mot. to Dismiss at 12–13. Given the context of the report and its preparation in the context of rising shareholder dissatisfaction, an equivalent, if not more powerful, inference may be made that a dominated board commissioned the report in an effort to whitewash the inevitable decision to let Vinod Gupta retain his perquisites.

---

**79.** To take only one example, the $64,000 in consulting payments provided to Vinod Gupta's wife's firm are not, on their own, inherently suspicious: successful individuals often marry other successful individuals, and a corporation should be able to take advantage of good personal relationships between employees and other skilled business people. If such transactions are blessed by truly independent directors convinced that they are acting in the best interests of shareholders, a company should not reject the services of skilled men or women simply because they happen to be married to another employee. The analysis changes, however, when these relationships are approved—or ignored—by a dominated board.

**80.** Am. Reply Br. in Supp. of Defs.' Mot. to Dismiss at 28.

**81.** Defendants note that the Raval Report did not create a duty on the part of the board to pursue Vinod Gupta for reimbursement for

an amendment to the 1997 Stock Option Plan that would increase the number of shares available to management. The principle beneficiary of the plan to that point had been Vinod Gupta, who as CEO and majority shareholder was edging ever closer to owning an outright majority of infoUSA shares. The amendment succeeded only narrowly, by a vote of 28, 2 million to twenty million, with Vinod Gupta providing twenty-three million votes in favor. In this context, it is hard to imagine information more material to an informed vote of shareholders than an accurate assessment of Vinod Gupta's ownership.

Although directors have a responsibility to communicate with complete candor in all shareholder communications, those that are issued with respect to a request for shareholder action are especially critical. Where, as here, the directors sought shareholder approval of an amendment to a stock option plan that could potentially enrich themselves and their patron, their concern for complete and honest disclosure should make Caesar appear positively casual about his wife's infidelity. Yet plaintiffs allege that the directors failed to reveal Vinod Gupta's beneficial ownership of 2.4 million shares held by his charitable foundation and trusts for his sons. Defendants provide me with no reason to infer that this misstatement was inadvertent or unknowing and, in any event, all reasonable inferences belong to plaintiffs at this stage of litigation. Count IV states a claim that the infoUSA directors affirmatively misrepresented a material fact criti-

cal to the consideration of an issue that later succeeded by a relatively narrow margin.[82]

### c. Exemption of Vinod Gupta from the Rights Plan

On the other hand, plaintiffs fail to make allegations necessary for the Court to conclude that the exclusion of Vinod Gupta from the scope of the Rights Plan constitutes a violation of fiduciary duties. As mentioned above, lacking allegations to the contrary, I must presume that the Rights Plan was adopted pursuant to an affirmative vote of a majority of disinterested directors.[83] Plaintiffs instead argue that the Rights Plan represents a self-evident violation of fiduciary duties because no rational board would implement a plan and yet exempt the large and conceivable threat posed by Vinod Gupta.

Yet plaintiffs must do more than merely prove that the Rights Plan is conceptually unwise. To rebut the presumption of business judgment, in the absence of allegations that the Rights Plan was not approved by a vote of the majority of disinterested directors, plaintiffs must show that the decision is one so egregious as to be beyond any reasonable business judgment. Given Vinod Gupta's significant shareholdings in infoUSA throughout the period relevant to the amended consolidated complaint, it is likely that any attempt to add him to the Rights Plan would result in immediate action on his part to increase his shareholding to a majority. A rational board—even assuming it wished to add

82. Although plaintiffs succeed in demonstrating that demand is excused, I pause to note that this aspect of Count IV presents a direct claim for relief on the part of shareholders. Where a disclosure claim states that a shareholder was denied the opportunity to exercise a fully-informed vote, the claim is direct, and where a significant shareholder's interest is increased at the sole expense of the minority,

such a claim is individual in nature and entitles plaintiffs to at least nominal damages. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772–776 (Del.2006).

83. The amended consolidated complaint does not even inform the Court of the composition of the board in 1997, when the Rights Plan was approved.

Vinod Gupta to the Rights Plan—might wait to do so until it knew that the almost inevitable takeover bid that would follow would be matched by a third-party offer and subsequent bidding war.

I cannot conclude that the board's alternative strategy for avoiding a takeover by Vinod Gupta, a series of letter agreements between infoUSA and its CEO, might not be the better of the two paths presented. Plaintiffs' arguments to the contrary are wholly conclusory, and Count IV must fail with respect to the Rights Plan.

### 5. Count V: Waste

 The amended consolidated complaint maintains that defendants committed two separate forms of waste: the millions of dollars of related-party transactions for the benefit of Vinod Gupta and the consultancy agreements with Clinton. The test for waste is a demanding standard. The Court must "apply a reasonable person standard and deny a claim of waste wherever a reasonable person might deem the consideration received adequate. When this difficult standard is applied in the liberal context of a motion to dismiss, in order for the complaint to survive the motion, the Court must find that in any of the possible sets of circumstances inferable from the facts alleged under the complaint, no reasonable person could deem the received consideration adequate."[84] Plaintiffs have already failed to meet this exacting burden with regard to the contracts with Clinton.[85]

 Plaintiffs succeed, however, in alleging a successful claim for waste. The amended consolidated complaint presents a series of related-party transactions and improper benefits allowed to flow to Vinod Gupta from a board that was dominated and controlled by him. Consider, for instance, the skybox at the University of Nebraska–Lincoln Football Stadium, acquired by infoUSA from Annapurna in 2003. The remaining lease on the skybox lasted twenty-one years, for which the company paid $617,000. The company's 2006 proxy statement states that Vinod Gupta originally paid $2 million for the skybox, and the amended consolidated complaint asserts that he received a $1.3 million charitable tax deduction on the purchase. The complaint alleges that the purchase price was based upon a $29,400 per year cost of twenty-eight tickets, and yet the value of these tickets was not discounted to a present value. Further, the purchase price did not reflect any amounts paid to Annapurna for use of the skybox in prior years. These allegations, if proven, suggest that a dominated board purchased permanent rights to a skybox that it was already leasing from its CEO, while conveniently forgetting to discount the value of tickets that mature at the same time that a baby born at the time of the transaction would be legally able to buy beer from a stadium vendor. A reasonable person might well consider this a sweetheart deal for Vinod Gupta, but would be hard pressed to find that the consideration was adequate.

---

**84.** *Apple Computer, Inc. v. Exponential Technology, Inc.*, 1999 WL 39547 (Del.Ch. Jan. 21, 1999).

**85.** *See supra* n. 44 and text accompanying. Note that the grants of options to Clinton, although potentially an *ultra vires* act because improperly approved, do not automatically constitute waste. Indeed, assuming *arguendo*

that the grant of options was given pursuant to a separate agreement between Vinod Gupta and Clinton, and that Vinod Gupta was not authorized to enter into such a contract, rescinding the options as a result of Count II might well leave Clinton with a claim against the company for unjust enrichment.

Like the rest of the related-party transactions, the story of the skybox supports the inference that the board of directors allowed Vinod Gupta to extract value from the company by selling his own assets to the corporation at inequitable prices. Although defendants will have the opportunity to rebut this evidence at trial, for the moment plaintiffs plead sufficient facts to maintain an action for waste.

## IV. CONCLUSION

Defendants' motion is denied with respect to Counts I and II, but granted with respect to Count III. Count IV of the amended complaint fails to allege facts sufficient to state a claim for breach of fiduciary duty arising from the exemption of Vinod Gupta from the Rights Plan. Defendants' motion is denied, however, with regard to all other parts of Count IV.

Count V of the amended complaint is dismissed with regard to the consultancy contracts with Clinton, but is sufficient to be sustained in all other respects.

Counsel shall confer and submit a form of implementing order within twenty days from this date.