**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

Sam Glasscock III
Vice Chancellor

Court of Chancery Courthouse
34 The Circle
Georgetown, Delaware 19947

Date Submitted: July 13, 2015
Date Decided: July 21, 2015

Blake A. Bennett, Esquire
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE 19899

William M. Lafferty, Esquire
Leslie A. Polizoti, Esquire
Lindsay M. Kwoka, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19801

Lisa A. Schmidt, Esquire
A. Jacob Werrett, Esquire
J. Scott Pritchard, Esquire
Richards, Layton & Finger P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Re:  *In re AbbVie Inc. Stockholder Derivative Litigation*,
Consolidated Civil Action No. 9983-VCG

Dear Counsel:

Where a corporation creates and then spins off a subsidiary, there is obvious business value in a clean break between the new entity and the old, including through mutual general releases of liability between the entities, and their employees and directors, as part of the transaction. Of course, where the directors approve such a release, which includes release of their *own* liability for theoretical claims that formerly the company, and now the sub, may have against them, they

convey some benefit to themselves as well. Whether such an approval, useful to the company on its face, invokes an equitable remedy nonetheless, on account of the directors' self-dealing, depends on the extent to which tangible, valuable choses in action against the directors are released, and on the directors' knowledge of such potential liability at the time they approved the transaction.

The matter before me involves the creation of a subsidiary, AbbVie Inc. ("AbbVie"), by Abbott Laboratories ("Abbott"), the transfer of assets and liabilities to AbbVie (including those relating to the drug TriCor, a former Abbott property), and, as part of that transfer, mutual releases that are problematic for the reasons described above. Subsequently, Abbott distributed all of its 100% interest in AbbVie as a dividend to its stockholders, who thereby became AbbVie stockholders as well. The Plaintiffs, AbbVie stockholders, seek to sue derivatively on behalf of AbbVie, alleging that at the time AbbVie was created, a former Abbott employee was pursuing damages in a *qui tam*[1] action against Abbott for purported violations of the False Claims Act in connection with Abbott's marketing of TriCor (the "Qui Tam Action"); that the Qui Tam Action persists, resulting in defense costs payable by AbbVie, and *might* result in damages against

---

[1] "*Qui tam*" is from the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which translates to: "who as well for the king as for himself sues in this matter." Black's Law Dictionary (10th ed. 2014). It is "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." *Id.*

2

AbbVie, which has assumed the TriCor liability; and that the facts of the Qui Tam Action *might* disclose that a chose in action existed at the time AbbVie was created, in favor of Abbott against its directors, under a theory of failure of oversight under the *Caremark* rationale or under a theory of bad faith. The Plaintiffs further assert that, should damages result from the Qui Tam Action, Abbott *would not* have an incentive to pursue a claim against its directors, because it had transferred TriCor-related liability to AbbVie and thus would suffer no damages, and AbbVie *could not* pursue the claim due to the mutual releases. In other words, the Plaintiffs point to that equitable anathema, a wrong without a remedy. They purport to sue the defendant directors derivatively on behalf of AbbVie, alleging that the releases represent a conflicted transaction, or constitute waste. The Plaintiffs seek to set aside the releases, freeing AbbVie—and the Plaintiffs derivatively—to pursue a *Caremark* or bad faith claim against Abbott's directors, should the Qui Tam Action prove fruitful and should the facts warrant.

The Plaintiffs lack statutory standing to derivatively sue the defendant directors for breach of duty in connection with the releases on behalf of AbbVie because they were not AbbVie stockholders at the time of the alleged wrong. They contend correctly, however, that this Court in *Shaev v. Wyly*[2] has allowed such an action in similar procedural circumstances, despite the statute, in light of

---

[2] 1998 WL 13858 (Del. Ch. Jan. 6, 1998), *aff'd,* 719 A.2d 490 (Del. 1998).

3

otherwise-irremediable self-dealing by directors of a parent. The remedy problem the Plaintiffs point to is real, and analogous to *Shaev*, but unlike that case, the equitable considerations here are too tenuous to support the equitable exception to the statute that Plaintiffs invoke.

## I. BACKGROUND FACTS[3]

*A. The Spin-Off and Separation Agreement*

In April 2012, Abbott incorporated AbbVie as its wholly owned subsidiary to hold Abbott's research-based pharmaceutical business. On November 28, 2012, Abbott's board of directors approved the separation of Abbott and AbbVie. The two entities entered into the Separation and Distribution Agreement By and Between Abbott Laboratories and AbbVie Inc. (the "Separation Agreement"), and Abbott declared a special dividend distribution of all outstanding shares of AbbVie common stock. On January 1, 2013, Abbott made the pro rata distribution of 100% of AbbVie's outstanding common stock to the Abbott stockholders of record as of December 12, 2012. AbbVie then became a publicly traded company on the New York Stock Exchange.

The Separation Agreement set forth the transfer of assets and liabilities from Abbott to AbbVie. It also contained "mutual releases," pursuant to which Abbott

---

[3] Unless otherwise indicated, all facts are taken from the Consolidated Amended Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty for Self-Dealing, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint").

4

and AbbVie each released the other of all liability in connection with the assets transferred to AbbVie and the assets retained by Abbott, respectively.[4] Relevant here, AbbVie's release of Abbott provided that AbbVie "does hereby . . . remise, release and forever discharge: (1) Abbott, each Abbott Subsidiary, and their respective successors and assigns; [and] (2) all Persons who at any time are or have been shareholders, directors, officers, agents or employees of Abbott or an Abbott Subsidiary" from all liabilities transferred to AbbVie (the "Release").[5] The liabilities transferred to AbbVie included those associated with the drug TriCor, an asset that was transferred to AbbVie.

At the time of the Release, the Qui Tam Action was (and it remains) pending. The Qui Tam Action was brought by a former employee in 2009, alleging that, during the time of her employment (2000 to 2008), Abbott engaged in marketing TriCor for off-label uses, in violation of the False Claims Act. The United States declined to intervene, and the action is being prosecuted by the relator, the former employee, on behalf of the United States. In January 2014, over a year after the Release was executed, a federal district court granted in part and denied in part Abbott's motion to dismiss the claim.[6]

---

[4] *See* Compl. ¶¶ 30–31; Opening Br. in Supp. of Mots. To Dismiss the Consolidated Am. Verified S'holder Deriv. Compl. Ex. A § 4.01.

[5] *Id.* § 4.01(a).

[6] *See U.S. ex rel. Bergman v. Abbot Labs.*, 995 F. Supp. 2d 357, 363 (E.D. Pa. 2014). The Defendants represent that the Qui Tam Action makes no allegations about Abbott's directors.

5

*B. The Parties*

The Plaintiffs were Abbott stockholders at the time of the Separation Agreement and received AbbVie stock in connection with Abbott's special dividend distribution on January 1, 2013. They have continuously held AbbVie stock since that time.

The nominal defendant AbbVie is a Delaware corporation with its principal place of business in Chicago, Illinois.

Defendant Richard A. Gonzalez, AbbVie's Chairman and CEO, signed the Separation Agreement on behalf of AbbVie.

The individual defendants include certain directors who sit on both the Abbott and AbbVie boards, who approved the Separation Agreement in their capacity as Abbott directors at the time: Robert J. Alpern, Roxanne S. Austin, Edward M. Liddy, and Glenn F. Tilton.

The remaining members of Abbott's board who approved the Separation Agreement on behalf of Abbott are also individual defendants: Sally E. Blount, W. James Farrell, Nancy McKinstry, Phebe N. Novakovic, William A. Osborn, Samuel C. Scott III, and Miles D. White, who is also Abbott's CEO. Gonzalez, Alpern, Austin, Liddy, Tilton, Blount, Farrell, McKinstry, Novakovic, Osborn, Scott, and White are together referred to as the "Individual Defendants."

*C. Procedural History*

Plaintiff Donald Dempster filed a complaint on July 31, 2014. A second complaint, by plaintiff Richard W. Berstein Irrevocable Family Trust-2006, was filed on August 12, 2014. I consolidated these actions on September 17, 2014. The Defendants filed motions to dismiss on October 17, 2014 and briefs in support of those motions on December 1, 2014. In response, the Plaintiffs filed the Amended Complaint on January 16, 2015. The Defendants again moved to dismiss and the parties submitted briefing on those motions that concluded in June. I heard oral argument on July 13, 2015.

## II. STANDARD OF REVIEW

Under Rule 23.1, which, among other things, procedurally implements 8 *Del. C.* § 327,[7] a derivative plaintiff must allege that he owned stock at the time of the complained-of transaction or that his shares devolved upon him by operation of law.[8]

Standing is a legal question that is well suited to resolution on a motion to dismiss. Where, as here, the question of standing is "so closely related to the merits," and the question is not whether this Court has jurisdiction to grant

---

[7] *See Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 178 (Del. Ch. 2014).

[8] Ct. Ch. R. 23.1. Rule 23.1 also requires a plaintiff to allege with particularity that demand has been made and wrongfully refused or that it would be futile and should be excused. Because I am deciding the pending Motions to Dismiss solely on the standing requirement set forth in 8 *Del. C.* § 327 and implemented by Rule 23.1, as discussed below, I need not reach the demand futility argument and the heightened pleading standard that it entails.

7

requested relief to *any* plaintiff, but rather, is whether the Court can grant the requested relief to *these* plaintiffs, the appropriate framework is under Rule 12(b)(6).[9]

On a motion to dismiss under Rule 12(b)(6), this Court accepts as true all well pleaded factual allegations, including even vague allegations if they give the opposing party notice of the claim, and draws all reasonable inferences in favor of the non-moving party.[10] The Court will deny a motion to dismiss unless, with the foregoing principles in mind, there is no reasonably conceivable set of circumstances under which the plaintiff could recover.[11]

### III. ANALYSIS

The Plaintiffs, in their capacity as AbbVie stockholders, are seeking to pursue derivatively a claim against certain of both Abbott's and AbbVie's directors for breaches of fiduciary duties in connection with their approval of the Release. The Plaintiffs allege:

> [B]ecause the wrongful conduct . . . occurred when AbbVie was a wholly owned subsidiary of Abbott and in connection with the Separation Agreement, in the context of this derivative action, the Individual Defendants owed fiduciary duties to Abbott shareholders prior to and in connection with the Separation, to Abbott, AbbVie's

---

[9] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285 (Del. 2007).
[10] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).
[11] *Id.*

sole shareholder before the spin-off, and to AbbVie shareholders at and after the time of the Separation Agreement.[12]

The Plaintiffs, however, purport to sue only on behalf of AbbVie.

The alleged harm in approving the Release, which approval the Plaintiffs contend was a self-dealing transaction, is that AbbVie has incurred litigation expenses relating to, and faces potential liability from, the Qui Tam Action, but is left without a chose in action against Abbott's directors for purported breaches of their fiduciary duties of loyalty in connection with the TriCor marketing. The ultimate relief sought is that the Release be rescinded, so that AbbVie may sue the Abbott directors for bad faith or lack of oversight in connection with the marketing of TriCor, and thus recoup any loss to AbbVie that might, hypothetically, result from the Qui Tam Action.

A stockholder wishing to pursue a derivative claim on behalf of a corporation must meet the standing requirements set forth in 8 *Del. C.* § 327:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.[13]

The Plaintiffs cannot meet this requirement since AbbVie was a wholly owned subsidiary at the time of the complained-of transaction, *i.e.*, the Release, in

---

[12] Compl. ¶ 24.

[13] As noted above, this statutory requirement is implemented by Court of Chancery Rule 23.1. *See Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 178 (Del. Ch. 2014).

November of 2012, and because the Plaintiffs received their stock by an Abbott dividend, rather than by operation of law.[14] The Plaintiffs, however, argue that they should be accorded equitable standing in order to redress a wrong to AbbVie that would otherwise go unremedied, consistent with this Court's holding in *Shaev v. Wyly*.[15]

In *Shaev*, a stockholder of a subsidiary sought to bring derivatively a claim on behalf of that subsidiary. The plaintiff had long been a stockholder of the parent entity and received shares in the subsidiary as a result of a spin-off of the parent's wholly owned subsidiary and a subsequent dividend. Prior to the spin-off, the subsidiary's directors granted themselves options on nine million shares of the subsidiary's stock, conveying to themselves corporate property with a net value of up to $245 million, which the plaintiff alleged to be excessive compensation. In finding that the plaintiff had standing to pursue the claim on behalf of the subsidiary, the Court noted that the plaintiff at one time had standing to maintain a double-derivative action as a stockholder of the parent entity, but had lost that right once the spin-off was complete. The Court noted that "to deny standing on these facts would insulate defendants from potential liability for their alleged

---

[14] The Complaint avers that the Plaintiffs received their shares by operation of law, but the Plaintiffs' briefing and oral argument more appropriately, in light of the receipt of shares by contract, relied on the theory of equitable standing under *Shaev*.

[15] 1998 WL 13858 (Del. Ch. Jan. 6, 1998) *aff'd*, 719 A.2d 490 (Del. 1998).

10

misdeeds."[16] It also noted that the purpose of Section 327 is to prevent the purchase of stock after a transaction solely for the purpose of pursuing a derivative claim based on that transaction, an evil absent in *Shaev* (and here as well).[17]

On a motion for reargument, the Court reiterated that its decision was a matter of equity:

> Here, plaintiff lost his chance to file a double derivative action because, after the spin-off, [the parent] and [the subsidiary] were no longer in a parent/subsidiary relationship. Were this Court to apply section 327 strictly, plaintiff would also be barred from filing a derivative action. Under those circumstances, I refuse, as I believe one charged with the duty to apply equitable principles must, to adhere blindly to a technical legal rule and to allow thereby an alleged corporate wrongdoer to thumb his nose at the possibility of redress. Thus, I found that plaintiff has *equitable* standing to bring a derivative action on [the subsidiary's] behalf, notwithstanding the fact that the challenged actions occurred before he owned any [of the subsidiary's] stock.[18]

The Plaintiffs contend that *Shaev* is on point with the present case: Like the Plaintiffs here, the plaintiff in *Shaev* challenged a transaction that allegedly harmed a wholly owned subsidiary, of which the plaintiff became a stockholder by way of dividend following a spin-off.

I do not read *Shaev* to say that the ownership requirement of Section 327 only applies where the Court determines that the plaintiff's motive is champertous, and otherwise is waived; such a policy determination would be for the legislature.

---

[16] *Id.* at *4

[17] *Id.* at *4, n.19.

[18] *Shaev v. Wyly*, 1998 WL 118200, at *2 (Del. Ch. Mar. 6, 1998), *aff'd*, 719 A.2d 490 (Del. 1998) (emphasis in original).

11

Instead, I read *Shaev* to hold that this Court will not countenance a wrong to stockholders by fiduciaries that is both egregious and irremediable; instead, this Court will employ a special equitable standing on behalf of a stockholder, where the complaint discloses a wrong abhorrent to equity. While this case and *Shaev* are procedurally similar, I find the equitable considerations at play in *Shaev* to be lacking here because the Plaintiffs have not pled facts from which I can reasonably infer that *AbbVie* was harmed.

The Plaintiffs allege that the Individual Defendants (other than Gonzalez, who was not an Abbott director at the time) "knowingly or recklessly acted contrary to the interests of Abbott and AbbVie when they approved the Separation Agreement because they failed to provide any material consideration to Abbott or AbbVie in exchange for the Release of liability."[19] The Plaintiffs allege that Gonzalez, AbbVie's CEO, was "acting contrary to the interests of Abbott when he signed the Separation Agreement [on behalf of AbbVie, then Abbott's wholly owned sub] because he failed to provide any material consideration to Abbott in exchange for the Release of liability."[20]

Even accepting as true all well pleaded factual allegations and drawing all reasonable inferences therefrom, I do not find it reasonably conceivable that AbbVie has been harmed such that the Plaintiffs here should be afforded equitable

---

[19] Compl. ¶ 96.
[20] *Id.* ¶ 95.

12

standing to proceed on behalf of AbbVie for alleged wrongdoing that occurred while AbbVie was a wholly owned subsidiary of Abbott.

I note at the outset that there is not a reasonably conceivable waste claim against the Individual Defendants for their approval of the Release. Waste involves claims that a board "'irrationally squander[ed]' corporate assets—for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all."[21] I do not find it reasonably conceivable that the Release lacked any business purpose. This Court has long recognized that derivative litigation is burdensome to companies, by way of the direct costs of the litigation, including advancement and indemnification obligations, as well as indirect costs, such as distraction to management and the board, and possible detriment to employee morale.[22] The Release here, moreover, is *not* simply a release of the defendant directors; it is a broad general release via which the two entities ensured their full legal separation, free of entanglement. To say that the Release is entirely devoid of value is conclusory and will not withstand judicial scrutiny, even on the lenient motion-to-dismiss standard, in the absence of

---

[21] *White v. Panic*, 783 A.2d 543, 554 (Del. 2001).

[22] *See, e.g., In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) ("A board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits. It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests.").

any facts from which I could reasonably infer that these benefits were lacking. The Complaint makes no such pleading.

Further to the point, the inchoate *benefit* to Abbott's directors at the time of the Release, and the corresponding "loss" to Abbott and its wholly owned subsidiary, AbbVie, is too attenuated to reasonably support an inference that the Release was a self-dealing transaction that harmed AbbVie and requires an equitable override of Section 327. At the time of the Release, the United States had already declined to intervene in the Qui Tam Action, in which it is the theoretical party-in-interest,[23] and Abbott had filed a motion to dismiss.[24] Even if the Action results in some kind of payout for which AbbVie is responsible because of the transfer of that liability from Abbott, there would remain a daunting leap between AbbVie's monetary liability for Abbott's off-label marketing of TriCor and Abbott's directors being personally liable for bad faith or failure of oversight in connection with that marketing. The pleadings are devoid of allegations that would support such a claim against Abbott's directors for the company's improper marketing of TriCor.[25]

---

[23] *See supra* note 1.

[24] *See U.S. ex rel. Bergman v. Abbot Labs.*, 995 F. Supp. 2d 357, 363 (E.D. Pa. 2014).

[25] The Complaint alleges that Abbott has faced scrutiny in the past for off-label marketing and that its peers have as well. It alleges that off-label marketing is endemic in the pharmaceutical industry. In particular, the Complaint alleges, in May 2012, Abbott paid a $1.5 billion settlement to resolve criminal and civil investigations regarding off-label marketing of Depakote. *See, e.g.,* Compl. ¶¶ 79–80. It does not, however, plead the Individual Defendants' culpability with respect to illegality in marketing TriCor, except in conclusory fashion.

14

Because I do not find it reasonably conceivable that harm to AbbVie[26] sufficient to compel equity to act arose from the Release, there are no grounds to depart from the general rule set forth in 8 *Del. C.* § 327 and grant equitable standing to the Plaintiffs here. Because I find the Plaintiffs lack standing to pursue this claim on behalf of AbbVie, I need not reach the other grounds for the Defendants' Motions to Dismiss. Defendants' Motions to Dismiss are, accordingly, granted.

To the extent the foregoing requires an order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

[26] In *Shaev*, the defendant directors conferred upon themselves options in the subsidiary's stock which would allow them to "extract from [the sub] between $139 million ad $245 million." *Shaev v. Wyly* 1998 WL 13858, at *1 (Del. Ch. Jan. 6, 1998), *aff'd,* 719 A.2d 490 (Del. 1998). Here, by contrast, incidental to a general mutual release, the defendant directors allegedly insulated themselves from liability for a theoretical fiduciary duty action that remains a gleam in the Plaintiffs' eyes. Because I find that the release, unlike the self-dealing transfer of assets in *Shaev*, does not offend equity so as to require equitable standing, this case must be dismissed. Having reached this result, I need not decide whether any action for breach of duty in regard to the release properly belongs to AbbVie—as the Plaintiffs assert—or to Abbott, or Abbott's stockholders who received the AbbVie shares directly. Nor need I decide whether liability of the directors arising from any illegal marketing of TriCor—which allegedly occurred by 2008— could withstand the application of the doctrine of laches.

15